**NUOVE INDUSTRIE ELETTRICHE di
LEGNANO S.p.A., Plaintiff,**

v.

**UNITED STATES, Defendant.**

**Court No. 88–01–00030.**

United States Court of
International Trade.

June 1, 1990.

Barnes, Richardson & Colburn, Andrew P. Vance, Bruno R. Pavia, Matthew T. McGrath and Josephine Belli, for plaintiff.

Stuart M. Gerson, Asst. Atty. Gen., David M. Cohen, Director, Commercial Litigation Branch, Civ.Div., U.S. Dept. of Justice, Platte B. Moring, III, and Office of the Chief Counsel for Import Admin., U.S. Dept. of Commerce, Mary Patricia Michel, of counsel, for defendant.

## OPINION

AQUILINO, Judge:

Unusual issues are presented in this action brought pursuant to 19 U.S.C. § 1516a(a)(2)(B)(iii) and 28 U.S.C. § 1581(c) for judicial review of the *Final Results of Antidumping Duty Administrative Review; Large Power Transformers From Italy*, 52 Fed.Reg. 46,806 (Dec. 10, 1987), of the International Trade Administration, U.S. Department of Commerce ("ITA"). They arise from a motion for judgment upon the agency record filed by the plaintiff and from papers filed by the defendant in opposition to this motion which include a motion to strike certain parts of plaintiff's

motion. In addition, the defendant has interposed a motion to dismiss the action as moot.

### I

It is necessary to discuss the question of mootness first. *E.g., North Carolina v. Rice*, 404 U.S. 244, 246, 92 S.Ct. 402, 404, 30 L.Ed.2d 413 (1971). The defendant summarizes its position as follows:

> Since the date of the filing of the complaint in this action, two events have occurred which have rendered this case moot. First, the Customs Service ... has liquidated all entries covered by the final results of the antidumping duty administrative review in *Large Power Transformers From Italy*, 52 Fed.Reg. 46806 (December 10, 1987). Second, the ... International Trade Administration ... has published its final results of the subsequent antidumping duty administrative review in *Large Power Transformers From Italy*, 53 Fed.Reg. 29367 (August 4, 1988). The liquidated entries are beyond the reach of this Court and the cash deposit rate determined in the second administrative review has now been superseded by the actual duty assessment rate determined in the third administrative review. Consequently, the granting of plaintiff's prayer for relief in this action would have no practical effect on either the actual duty assessment rate or the cash deposit of estimated duties determined in the second administrative review. Since this Court no longer has the ability to provide some presently effective or meaningful remedy to any injury suffered by the plaintiff, this action has become moot and should be dismissed.[1]

However, among other relief, the plaintiff seeks a ruling that it is not affected by the finding of dumping of large power transformers from Italy originally published at 37 Fed.Reg. 11,772 (June 14, 1972). Since that time, the finding has covered merchandise imported from Industrie Elettriche di Legnano S.p.A. ("I.E.L."). The administrative review which is the basis of

---

**1.** Defendant's Motion to Dismiss for Mootness,   pp. 1–2.

this action established a margin of 17.13 percent for I.E.L. for the period May 1974 to May 1980 and a margin of 71.40 percent for the periods June 1980—May 1981 and June 1981—May 1986. *See* 52 Fed.Reg. at 46,811.

The record of that proceeding also shows that a decree of the Italian Ministry of Industry placed I.E.L. under "Extraordinary Administration"[2] in June 1981 by a government-appointed commissioner. In December 1981, Finanziaria per l'Industria Elettromeccanica S.p.A. was incorporated, which changed its name in April 1984 to Nuova Industrie Elettriche di Legnano S.p.A.[3] ("N.I.E.L."), the plaintiff herein. Thereafter, the company entered into an agreement with the I.E.L. commissioner to acquire assets and certain liabilities from the estate. *See* R.Doc 337. As a result, the plaintiff now "engages in the business of manufacturing power transformers and operates with the facilities and at the location previously used by I.E.L."[4], although it has not exported any of its products to the United States.

The action at bar seeks to avoid the consequences of I.E.L.'s prior exports at less than fair value. Plaintiff's position is that it did not assume them and that it is not I.E.L.'s successor in interest. The ITA, as discussed more fully hereinafter, reached a contrary determination.

There is no dispute that the plaintiff is an "interested party" within the meaning of 19 U.S.C. § 1677(9)(A), that it was a party to the administrative proceedings and that it therefore now has standing to bring this action pursuant to 19 U.S.C. § 1516a. It is axiomatic, however, that this court cannot adjudicate a matter that is moot, nor can it render an advisory opinion. The court can only exercise jurisdiction over an actual case or controversy and only where such exercise can redress some injury suffered by a litigant. *E.g., Iron Arrow Honor Society v. Heckler,* 464 U.S. 67, 70, 104 S.Ct. 373, 374–75, 78 L.Ed.2d 58 (1983); *Simon v. Eastern Kentucky Welfare Rights Organization,* 426 U.S. 26, 38, 96 S.Ct. 1917, 1924, 48 L.Ed.2d 450 (1976). Simply stated, "a case is moot when the issues presented are no longer 'live' or the parties lack a legally cognizable interest in the outcome." *Powell v. McCormack,* 395 U.S. 486, 496, 89 S.Ct. 1944, 1950–51, 23 L.Ed.2d 491 (1969); *Murphy v. Hunt,* 455 U.S. 478, 481, 102 S.Ct. 1181, 1183, 71 L.Ed.2d 353 (1982).

■ In this action, the court is unable to conclude that the issue(s) presented by the plaintiff are no longer live or that the parties lack a legally cognizable interest in the outcome. Stated another way, the position taken by the defendant, and the trade cases relied on for support, are inapposite. In *United States Steel Corporation v. United States,* 792 F.2d 1101 (Fed.Cir.1986), the appellant had failed to obtain suspension of liquidation of the entries at issue on judicial review. By the time of oral argument, all of them had been liquidated, whereupon the appeal was dismissed on the ground that it "would not redress the alleged injury of U.S. Steel because it could not reach the entries in question." *Id.* The injury alleged in that case, namely, liquidation at an erroneous rate of duty before completion of judicial review, stemmed from the ITA's termination of suspension thereof based on its interpretation of section 606 of

---

**2.** The record indicates that this status applies to companies

> having certain characteristics as to the number of employees and indebtedness.
>
> The law provides that th[ose] ... companies ... are no longer subject to bankruptcy or other insolvency proceedings, but to Extraordinary Administration.
>
> Extraordinary Administration is governed by the principles of bankruptcy and, in fact, it is a particular type of insolvency proceeding which considers the interests of the creditors as well as those of employees and the Italian economy in general. As a consequence of

such principle, the law ... expressly foresees the sale of assets on a going concern basis.

Record Document ("R.Doc") 337, fourth page.

**3.** The misspelling of this name in the caption of this action stems from the original pleading. Plaintiff's papers indicate that, in any event, the company changed its name a third time (in 1988) to A.B.B. Trasformatori S.p.A. and refers to a motion to formally change the caption, but no such motion has been received by the court.

**4.** R.Doc 323, p. 3.

the Trade and Tariff Act of 1984. *See generally United States Steel Corp. v. United States*, 9 CIT 453, 618 F.Supp. 496 (1985). This is not the injury the plaintiff complains of in this action, nor is its situation similar to that of U.S. Steel.

The defendant also attempts to rely on *Fabricas El Carmen, S.A. v. United States*, 12 CIT ——, 680 F.Supp. 1577 (1988); *PPG Industries, Inc. v. United States*, 11 CIT 303, 660 F.Supp. 965 (1987); *Alhambra Foundry v. United States*, 10 CIT 330, 635 F.Supp. 1475 (1986); and *Silver Reed America, Inc. v. United States*, 9 CIT 221, 1985 WL 25761 (1985). These cases indicate that subsequent administrative reviews conducted pursuant to 19 U.S.C. § 1675 usually moot existing lawsuits based on prior such reviews or administrative determinations. *See, e.g., McKechnie Brothers (N.Z.) Ltd. v. U.S. Department of Commerce*, 14 CIT ——, 735 F.Supp. 1066 (1990). This occurs when the relief sought, and the issues raised thereby, are tied inextricably to duties on particular entries.

In this action, there were no entries of merchandise from the plaintiff for that part of the period reviewed by the ITA during which N.I.E.L. was in business in the place of I.E.L., June 1984 to May 1986.[5] The agency stated, however:

> Because N.I.E.L. is the successor company to I.E.L., we will instruct the U.S. Customs Service to apply the cash deposit rate of I.E.L. to any future entries of merchandise produced by N.I.E.L. and exported to the U.S. 52 Fed.Reg. at 46,806.

This is the determination primarily at issue in this action, and it is not time-restricted, a point which is reflected in the ITA's *Final Results of Antidumping Duty Administrative Review; Large Power Transformers from Italy*, 53 Fed.Reg. 29,367 (Aug. 4,

1988), for the subsequent period June 1986 to May 1987. This issue is live and causing injury to the plaintiff[6]. It is ripe for adjudication, and defendant's motion to dismiss therefore cannot be granted on the ground that this action is moot.

## II

Plaintiff's motion for judgment upon the agency record is accompanied by a voluminous exhibit "A", which is comprised of an opinion of an Italian law firm, attached to which are some 28 Italian legal documents. The opinion concludes that

> N.I.E.L. is not the successor of and therefore cannot be held liable for the liabilities of I.E.L. past or future to the United States of America nor [*sic*] the prospective liabilities for dumping duties of merchandise exported by N.I.E.L. to the United States be grounded on the determinations based on actions of I.E.L.

The plaintiff has also filed an exhibit B, which is a copy of the agreement between the I.E.L. commissioner and N.I.E.L. entered into on June 28, 1984, plus a translation thereof into English.

The defendant has moved to strike these exhibits *in toto* and also to strike those portions of plaintiff's motion relying on them. The claim is that they represent an impermissible attempt to amend or supplement the administrative record. Ample precedent is cited in support of the rule that, absent exceptional or rare circumstances, matter not before the administrative agency and part of its record is inadmissible on judicial review thereof. *E.g., McKechnie Brothers (N.Z.) Ltd. v. U.S. Department of Commerce*, 10 CIT 707, 1986 WL 13131 (1986), and cases cited therein.

Although such circumstances do not exist here, grant of defendant's motion does not necessarily follow for it is not clear

---

**5.** According to the record, I.E.L. continued to exist as a separate legal entity, albeit under Extraordinary Administration, until November 4, 1988. The last time it exported to the United States was May 1981.

**6.** In *Valley Forge Christian College v. Americans United for Separation of Church and State, Inc.*,

454 U.S. 464, 486, 102 S.Ct. 752, 766, 70 L.Ed.2d 700 (1982), the Court indicated that the requirement is *"injury of any kind, economic or otherwise"* (emphasis in original). Such injury is evident from the record in this action. *See generally* Points III and IV, *infra*.

that the contested exhibits amount to an attempted expansion of the record or to information beyond that presented to the ITA and already contained in its record. Successorship of I.E.L. was an issue, and counsel for the respondents involved provided the agency, for example, with a prehearing brief and exhibits on this issue not unlike those now sought to be stricken. *See generally* R.Doc 323 (and Confidential Document 57). The defendant admits as much as to exhibits A–1, A–2 and B[7] but claims that, if the plaintiff desires to make argument regarding them, it should cite the documents enumerated in the record.

Defendant's reference to the word argument is appropriate, as the court finds plaintiff's present motion papers as a whole to be "within the realm of permissible argument in support of judicial review." *Roses, Incorporated v. United States*, 13 CIT ——, ——, 720 F.Supp. 180, 182 (1989). Stated another way, the court's comparison of the record with those motion papers shows that the latter do not make points not pressed during proceedings below.

Count I of the complaint (para. 9) contests the ITA's determination that "N.I. E.L. is the successor company to I.E.L." as not supported by substantial evidence in the record and contrary to law. This second, alleged basis for reversal calls into question, at least arguably, the law of Italy, as well as that of the United States. While the administrative proceedings and the complaint have informed the defendant of this point of view, the plaintiff has also served and filed "written notice of its intention to present evidence of foreign law in support of its position", citing CIT Rule 44.1, which provides:

Determination of Foreign Law

A party who intends to raise an issue concerning the law of a foreign country shall give notice by pleadings or other reasonable written notice. The court, in determining foreign law, may consider any relevant material or source, including testimony, whether or not submitted by a party or admissible under the Federal Rules of Evidence. The court's determination shall be treated as a ruling on a question of law.

On its face, this rule, which is verbatim Rule 44.1 of the Federal Rules of Civil Procedure ("FRCivP"), permits the court to consider plaintiff's papers in deciding whether the ITA's determination was in accordance with law within the meaning of 19 U.S.C. § 1516a(b)(1)(B). Prior to 1966, the law of a foreign country was treated as a question of fact to be pleaded and proved. *See, e.g., Walton v. Arabian American Oil Co.,* 233 F.2d 541 (2d Cir.), *cert. denied,* 352 U.S. 872, 77 S.Ct. 97, 1 L.Ed.2d 77 (1956); *Albert v. Brownell,* 219 F.2d 602 (9th Cir.1954); *Chicago Pneumatic Tool Co. v. Ziegler,* 151 F.2d 784 (3rd Cir.1945). *See also* 9 Wright & Miller, Federal Practice & Procedure: Civil §§ 2441–47 (1971); Miller, *Federal Rule 44.1 and the "Fact" Approach to Determining Foreign Law: Death Knell for a Die-Hard Doctrine,* 65 Mich.L.Rev. 613 (1967). Rule 44.1 was then adopted to "furnish Federal courts with a uniform and effective procedure for raising and determining an issue concerning the law of a foreign country." 28 U.S.C.A. F.R.Civ.P. 44.1, at 292 (1984). In an action bridging adoption of the rule, *Bamberger v. Clark,* 390 F.2d 485 (D.C.Cir. 1968), the outcome of proceedings before the Alien Property Custodian turned on the meaning and interrelation of two provisions of the German Civil Code. The court of appeals stated:

Under rules now applicable a question of foreign law is treated in the Federal courts as calling for a ruling on a question of law rather than fact. That rule does not necessarily dispose of cases that arise in the context of an administrative record, since in some instances at least a court will defer to an agency's view of a question of law even though the court itself would not have decided the question the same way if it had considered the matter in the first instance—assuming of course that the agency's view is not unreasonable or contrary to the plainly ascertainable intent of the legislature.

---

**7.** *See* Defendant's Motion to Strike, p. 4, n. 4.

The doctrine of deference to the rulings of an administrative or executive agency, department or official has broadest scope when the legal question is one involving the meaning of a statute continually applied and interpreted by the executive branch. But it also has application to other issues, and certainly we would agree that in ascertaining the foreign law we pay careful attention to the expert testimony adduced at the agency hearing, and to the agency's view. 390 F.2d at 488 (footnotes omitted).

Nevertheless, the court overruled the agency view in that action, although the stated approach continues to be followed. *See, e.g., Merck & Co. v. U.S. International Trade Commission,* 774 F.2d 483, 488 (Fed.Cir.1985).

Despite citation of Rule 44.1 in its motion to strike, concession that the proffered opinion on Italian law might be probative[8], and also the fact that that law was properly raised before the ITA, the defendant argues that plaintiff's papers "would impermissibly alter the scope of judicial review in this action."[9] This argument would be of moment were those papers directed at the substantial-evidence-on-the-record review standard of section 1516a(b)(1)(B), *supra,* for the record here cannot be supplemented and the court cannot freely substitute its views thereof for those of the ITA. But the papers attempt to address the accordance-with-law standard of that section, and, while the traditional rule that "[q]uestions of law are reviewed under the non-deferential, de novo standard"[10] may not apply under that standard in the light of *Bamberger v. Clark, supra,* that case certainly does not preclude full and fair consideration of plaintiff's argument by this court.

Indeed, that kind of consideration requires that defendant's motion to strike be denied. *See generally Jimlar Corp. v. United States,* 10 CIT 671, 647 F.Supp. 932 (1986).

## III

■ In response to plaintiff's argument, the ITA stated in its final determination that the

entire business complex of I.E.L. was transferred to N.I.E.L., including production assets, land, contracts, patents, and all commercial activity. After review of the transfer documents we conclude that the activities of I.E.L. are being continued under N.I.E.L. The fact that N.I.E.L. may not have assumed responsibility for I.E.L.'s antidumping obligations is not relevant to the determination that N.I.E.L. is the successor company. We maintain our position that N.I.E.L. is the successor company to I.E.L. 52 Fed. Reg. at 46,810.

The defendant supports this stance now but also argues that whether "NIEL is the same legal corporation as IEL under either Italian or United States law ... is not determinative of whether NIEL should receive IEL's cash deposit rate for antidumping purposes." Defendant's Memorandum, p. 18.

In accordance with the Trade Agreements Act of 1979, as amended, the ITA is required to publish its determination of foreign market value and U.S. price and to use that determination as "the basis for the deposit of estimated antidumping duties on future entries of merchandise ... to which the [antidumping-duty] order ... applies." 19 U.S.C. § 1673e(c)(3). The requirement is the same after administrative review of such determinations. 19 U.S.C. § 1675(a)(2). Hence, under the statute, cash deposit rates are "estimated", although they are to "be as closely tailored to actual antidumping duties as is reasonable given data available to ITA at the time the antidumping duty order is issued". *Badger–Powhatan, A Div. of Figgie Int'l, Inc. v. United States,* 10 CIT 241, 250, 633 F.Supp. 1364, 1373, *appeal dismissed,* 808 F.2d 823 (Fed.Cir.1986).

**8.** *See id.* at 3.

**9.** *Id.* at 1.

**10.** *United States v. McConney,* 728 F.2d 1195, 1201 (9th Cir.), *cert. denied,* 469 U.S. 824, 105 S.Ct. 101, 83 L.Ed.2d 46 (1984).

Of course, adjustments are made at the time of liquidation in accordance with 19 U.S.C. § 1673f. Despite legislative history which "recognizes the effect that the requirement of a cash deposit of estimated duties may have on importers, particularly small businesses, and does not wish to unduly burden those importers who have, in fact, taken steps to eliminate dumping", Congress intended to counteract dumping and ensure expeditious administration of antidumping orders by making a "major change" which requires that all merchandise subject to such an order "be entered only upon the deposit of estimated antidumping duties." H.R.Rep. No. 317, 96th Cong., 1st Sess. 69 (1979). In explaining the change from the past practice of allowing merchandise subject to such an order to enter under bond, the report states:

> ... The Committee feels strongly that this practice does not sufficiently deter dumping. Rather, it provides an incentive to exporters and importers to delay in submitting the information necessary to form the basis of an assessment. The Committee believes that the requirement of cash deposits will ensure that complete information will be submitted to the Authority in a timely manner. *Id.*

Plaintiff's suggestion that cash deposit rates are analagous to debts or liabilities due on past acts, and its argument that applying I.E.L.'s cash deposit rate to N.I.E.L. is a prohibitive penalty or effective embargo on its ability to export its power transformers to the United States, are not in accord with either the purpose or the practice of requiring cash deposits.

Be that as it may, prior to the publication of the preliminary results (at 52 Fed.Reg. 23,708 (June 24, 1987)) of the ITA's review at issue herein, N.I.E.L. had taken the position that it was indeed I.E.L.'s successor. For example, the record contains a letter from the company to the Commerce Department dated December 10, 1985 which explains that it is "continuing the activity of I.E.L." and seeks "confirmation that to Nuova Industrie Elettriche di Legnano has to be applied the additional duty assessed for I.E.L. (3%) and not the general duty for other Italian firms." R.Doc 200. The ITA provided this confirmation. *See* R.Docs 201, 202. Another company letter (dated January 19, 1987) concluded:

> As successors to the activity of OLD IEL, we consider ourselves bound by the prior antidumping proceedings but only as they effect [*sic*] operations after our purchase of OLD IEL. Accordingly, we decline any responsibility ... for sales prior to July 1984.

R.Doc 231, p. 2. The letters had been sent against a background of the final results of the ITA's first administrative review, which stated, among other things:

> ... For any future entries from a new exporter not covered in this or prior reviews, whose first shipments of large power transformers occurred after May 31, 1983, and who is unrelated to any reviewed firm, a cash deposit of 92.47 percent shall be required. For Legnano we shall not require a cash deposit of estimated antidumping duties until we complete our administration [*sic*] review of the firm. These deposit requirements shall remain in effect until publication of the final results of the next administrative review.

49 Fed.Reg. at 31,316.

Of course, the final results of that next administrative review were essentially the reverse of these first results: a margin of 71.40 percent was established for the period during which N.I.E.L. came into existence, while the ITA determined that

> [f]or any future shipments of this merchandise from a new exporter not covered in this or prior administrative reviews, whose first shipments occurred after May 31, 1986 and who is unrelated to any previously reviewed firm, a cash deposit of 0.0 percent shall be required. 52 Fed. Reg. at 46,811–12.

On the existing record, the plaintiff can hardly argue now that it is "new" and "unrelated to any previously reviewed firm". Rather, it is left to contend, as indicated above, that its derivation did not entail succeeding to I.E.L.'s margin as a matter of corporate law. However, before the court need resolve this contention,

there must be a showing that the controlling trade law of the United States requires resort to that law, and the plaintiff has not satisfied its burden of persuasion in this regard.

In fact, plaintiff's memoranda of law do not cite any U.S. trade law on point. Rather, in addition to the law of Italy, they refer to this country's corporate law[11] and also attempt to portray the N.I.E.L. correspondence with Commerce referred to above as "made without advice of American counsel and without an understanding of the possible interpretation of its usage of certain terminology, *i.e.*, 'successor'." Plaintiff's Reply Brief, p. 3. *See also id.* at 7.

However, no amount of sage advice on, or understanding of, the law governing the ITA could have discerned an obligation to carry out administrative responsibilities in this matter based on the corporate law of either Italy or the United States. The agency's obligation was to review the totality of the Legnano commercial activities in determining a cash deposit rate for the product(s) thereof. The ITA decided, in the exercise of its sound discretion, that the cash deposit rate established for I.E.L. should apply to any exports emanating from that company's facilities operated under different management, pending administrative review thereof for assessment of actual antidumping duties. The ultimate question was whether the activities in Italy were "old" or "new". The agency found them to be old, and there is substantial evidence on the record in support of this determination. The ultimate question was not the status of N.I.E.L. under Italian law[12], nor did the law here require the ITA to give a definitive answer to that question.

In sum, the court cannot conclude that the agency's approach in this regard was not based on substantial evidence in the record or otherwise in accordance with law.

## IV

■■ Plaintiff's motion for judgment on the agency record also takes the position that the ITA's decision to base a cash deposit rate on the last 12–month period of I.E.L. shipments within a 12–year time frame was unreasonable and contrary to law. As to time, the agency's determination states:

> ... Although the review covers shipments for twelve years we established a cash deposit rate based on the last 12–month period with shipments. We believe the margin for the most recently reviewed period is generally the best estimate we have of the producer's current behavior. Therefore, it is appropriate to use the most recent rate as the cash deposit rate. This is consistent with the cash deposit rates we have established in previous reviews of these transformer findings. 52 Fed.Reg. at 46,810.

The 12–month and –year periods were June 1980—May 1981 for the last I.E.L. shipments and May 1974 to May 1986 for I.E.L.'s activities as a whole. The record indicates that there were some 36 entries from Legnano during the time May 1974 to May 1980, which the ITA aggregated in setting a weighted-average margin of 17.13 percent for them. Apparently, there were only three entries during the period June 1980—May 1981 and which were used as the basis of the 71.40 percent margin. No entries occurred thereafter.

The plaintiff argues that "[i]f the 39 total shipments were considered together in a single period from 1974–81, the margin rate and corresponding cash deposit rate would be dramatically lower." Plaintiff's Memorandum, p. 19. Defendant's response is that:

> there are other cases where the nature of the commercial activities after a corporate restructuring or acquisition are less clear. In such cases, the corporate legal relationship may become more important in the determination.

Defendant's Memorandum, p. 19.

---

**11.** *E.g., Santa Maria v. Owens–Illinois, Inc.,* 808 F.2d 848 (1st Cir.1986); *Araserv, Inc. v. Bay State Harness Horse Racing & Breeding Ass'n, Inc.,* 437 F.Supp. 1083 (D.Mass.1977); Shector, *Acquiring Corporate Assets Without Successor Liability: Is It a Myth?,* 1986 Colum.Bus.L.Rev. 137, 139.

**12.** The defendant concedes that

Transformer cases are unusual in that the reviews cover large, expensive items which are not sold in vast quantities.... The margin calculations ... are complicated and must be individually calculated by the case analyst.... [I]n performing the analysis in this review, it was readily apparent to Commerce that there was a drastic increase in the level of dumping in the last year for which there were sales covered by the review period. The Department concluded that this increased dumping had to be reflected in the deposit of estimated duties.[13]

Since submission of these opposing memoranda, the Court of Appeals for the Federal Circuit has decided *Rhone Poulenc, Inc. v. United States*, 899 F.2d 1185 (1990), which sheds light on plaintiff's position here. In that case, the ITA had issued an antidumping-duty order establishing a margin of 60 percent for sales at less than fair value in 1980. Four subsequent administrative reviews had found either no sales or sales at fair value, which led the agency to reduce the cash deposit rate to zero. However, during the fifth and sixth such reviews, covering 1984 and 1985 entries, the ITA rejected the exporter's questionnaire responses and determined to revert to the original 60 percent margin, which again became the figure for cash deposits. *See Final Results of Antidumping Duty Administrative Review; Anhydrous Sodium Metasilicate From France*, 52 Fed.Reg. 33,856, 33,857 (Sept. 8, 1987). The single issue on appeal was "whether the CIT erred as a matter of law in upholding the 60 percent margin from the original LTFV investigation as the 'best information' of Rhone Poulenc's 1984 and 1985 margins." 899 F.2d at 1189. In answering this question in the negative, thereby affirming the CIT (and ITA), the court of appeals held, among other things:

... Although ... Congress desired the ITA always to use the most recent infor-

mation in administrative reviews, it does not follow ... that the ITA must *equate* "best information" with "most recent information." What is required is that the ITA obtain and *consider* the most recent information in its determination of what is best information.

\* \* \* \* \* \*

Here the 1982 and 1983 [zero] margins were clearly within the pool of information *considered* by the ITA in determining which data were the "best information" of Rhone Poulenc's current margins.

*Id.* at 1190 (emphasis in original). The court rejected a claim that the agency's determination was "punitive", opining that the statute allows the ITA to presume that the highest prior margin was the best information of current margins. *Id.*

While that case arose out of controversy over compliance with agency questionnaires, its import for this action is unmistakable. In fact, the ITA opted for the most recent entries in setting the deposit rate in this matter. That they occurred years ago is not the responsibility of the agency. As the court of appeals pointed out, "making an actual importation was the proper way to establish that conditions had changed." [14]

This is not to say that it is impossible to hypothesize a reasonable basis for a different approach [15], only that the ITA's determination is clearly within the bounds of the law. Stated another way, the plaintiff has not cited any law as requiring the approach it prefers. Its complaint is thus with the exercise of agency discretion, a situation in which the rule is that a "reviewing court must accord substantial weight to an agency's interpretation of a statute it administers." *American Lamb Co. v. United States*, 785 F.2d 994, 1001 (Fed.Cir.1986), citing *Zenith Radio Corp. v. United States*, 437 U.S. 443, 450–51, 98 S.Ct. 2441,

---

**13.** Defendant's Memorandum, p. 26.

**14.** *Rhone Poulenc, Inc. v. United States*, 899 F.2d 1185, 1187 (Fed.Cir.1990), citing *PQ Corp. v. United States*, 11 CIT 53, 54, 652 F.Supp. 724, 727 (1987). According to the opinion of the court of appeals, the importer followed that

advice and achieved the zero deposit rate on subsequent imports.

**15.** *See, e.g., Matsushita Electric Industrial Co. v. United States*, 750 F.2d 927, 936 (Fed.Cir.1984).

2445–46, 57 L.Ed.2d 337 (1978); *Udall v. Tallman,* 380 U.S. 1, 16, 85 S.Ct. 792, 801, 13 L.Ed.2d 616 (1965).

Adherence to this rule in this action requires denial of plaintiff's motion for judgment upon the agency record and entry of judgment for the defendant.

## JUDGMENT

This action having been duly submitted for decision, and the court, after due deliberation, having rendered a decision herein; Now, therefore, in conformity with said decision, it is

ORDERED that defendant's motion to dismiss for mootness be, and it hereby is, denied; and it is further

ORDERED that defendant's motion to strike be, and it hereby is, denied; and it is further

ORDERED that plaintiff's motion for judgment on the agency record be, and it hereby is, denied; and it is further

ORDERED, ADJUDGED and DECREED that this action be, and it hereby is, dismissed.