**GENERAL HOUSEWARES CORP., Plaintiff,**

v.

**UNITED STATES of America and United States Department of Commerce, Defendants.**

**TROQUELES Y ESMALTES, S.A. and Cinsa, S.A., Plaintiffs,**

v.

**UNITED STATES, Defendant.**

Nos. 87–01–00020, 87–01–00022.

United States Court of International Trade.

Jan. 30, 1992.

Kilpatrick & Cody, Atlanta, Ga. (Joseph W. Dorn, Martin M. McNerney and Gregory C. Dorris), for General Housewares Corp.

Brownstein Zeidman and Schomer, Washington, D.C. (Irwin P. Altschuler, David R. Amerine, Ronald M. Wisla and Jeff P. Man-

ciagli), for Troqueles y Esmaltes, S.A. and Cinsa, S.A.

Stuart M. Gerson, Asst. Atty. Gen., David M. Cohen, Director, Commercial Litigation Branch, Civ. Div., U.S. Dept. of Justice (M. Martha Ries); and Office of Chief Counsel for Import Admin., U.S. Dept. of Commerce (Craig R. Giesse), Washington, D.C., of counsel, for defendants.

## OPINION

AQUILINO, Judge:

These actions contest certain aspects of the *Final Determination of Sales at Less Than Fair Value: Porcelain–On–Steel Cooking Ware From Mexico*, 51 Fed.Reg. 36,435 (Oct. 10, 1986), of the International Trade Administration ("ITA").[1]

## I

The defendant has interposed a motion to dismiss part of action No. 87–01–00022 on the ground that publication of *Porcelain-on–Steel Cooking Ware From Mexico; Final Results of Antidumping Duty Administrative Review*, 55 Fed.Reg. 21,061 (May 22, 1990), has rendered the matter moot as to TRES.[2] That is, while challenge to the determination could result in revocation of the antidumping-duty order as to Cinsa, it could only reduce, not eliminate, the margin determined for TRES. As the final results of the administrative review govern assessment, the defendant argues, a recalculation of the original TRES margin would have no effect.

TRES and Cinsa recognize the point [3] but counter that they are challenging the validity of the underlying order:

> If the ITA remand determination were to exclude CINSA from the final affirmative LTFV determination, the Court would have the authority to remand the case to the Commission to redetermine whether Mexican imports excluding CINSA ... were the cause of material injury to the domestic industry. Moreover, a remanded ITA determination as to TRES resulting in significantly reduced LTFV margins may also impact a Commission redetermination of injury. Accordingly, the Defendant is incorrect in asserting that TRES is merely seeking to adjust an irrelevant duty deposit rate. For TRES, the establishment of an accurate antidumping margin in the original investigation will impact a possible Commission redetermination as to whether TRES' imports caused material injury to the domestic industry. Thus, the controversy involving the foreign exchange rates used by the ITA in its final LTFV determination could very well determine the validity of the antidumping duty order as it applies to both CINSA and TRES.

Plaintiffs' Memorandum in Opposition to Defendant's Partial Motion to Dismiss, pp. 4–5, citing *Borlem S.A.–Empreedimentos Industriais v. United States*, 13 CIT 231, 710 F.Supp. 797 (1989).

In *Borlem*, the ITC had determined that the industry in question was threatened with material injury. That determination, however, was based on an ITA finding of

---

**1.** In addition, the complaint filed in action No. 87–01–00022 on behalf of Troqueles y Esmaltes, S.A. ("TRES") and Cinsa, S.A., respondents in the administrative proceedings, prays for judicial review of the material-injury determinations of the International Trade Commission ("ITC") *sub nom. Porcelain–On–Steel Cooking Ware From Mexico, the People's Republic of China, and Taiwan,* 51 Fed.Reg. 42,946 (Nov. 26, 1986). However, the later-filed Memorandum of Points and Authorities in Support of Plaintiffs' Rule 56.1 Motion for Judgment on the Agency Record ("TRES/Cinsa Memorandum") has dropped certain claims against the ITC, and their reply brief abandons remaining claims in the light of *Chaparral Steel Co. v. United States,* 901 F.2d 1097 (Fed.Cir.1990), save a representation at page 3 thereof that a remand to the

Commission might be necessary should their challenge to the ITA determination succeed.

**2.** Intervenor-defendant General Housewares Corp. ("GHC"), the petitioner below, joins in the motion to dismiss.

The court notes in passing that final results of a second administrative review have also been published, at 55 Fed.Reg. 39,186 (Sept. 25, 1990).

**3.** *See, e.g.,* Plaintiffs' Memorandum in Opposition to Defendant's Partial Motion to Dismiss, pp. 2–3; TRES/Cinsa Memorandum, p. 4; TRES/Cinsa Reply Brief, p. 21. The quality of these and the other memoranda submitted has obviated any need for oral argument.

sales at less than fair value, and judicial remand of that finding resulted in a *de minimis* margin for one of the two respondents. They thereupon sought remand to the Commission to reconsider its threat determination in light of its "long-standing practice of excluding from an *original* final injury determination import volume, pricing or other data for any firm excluded by Commerce from the scope of Commerce's *original* final determination." 13 CIT at 235, 710 F.Supp. at 800 (emphasis in original). The Court of International Trade granted remand, but the ITC then concluded that it had no authority to reconsider its original determination. On return to court, that conclusion was reversed. *Borlem S.A.-Empreedimentos Industriais v. United States*, 13 CIT 535, 718 F.Supp. 41 (1989), *aff'd*, 913 F.2d 933 (Fed.Cir.1990).

■ Relying on the *Borlem* decisions, the plaintiffs suggest that, if this court were to remand, and ITA recalculation were to result in the exclusion of Cinsa, remand to the Commission might be appropriate. Their suggestion is well-taken. Although publication of the results of a final administrative review generally renders actions based on prior determinations moot[4], where the validity of the order underlying that review, rather than the duty for dumping, is at issue, a party continues to be possessed of "a legally cognizable interest in the outcome." *Nuove Industrie Elettriche di Legnano S.p.A. v. United States*, 14 CIT ——, ——, 739 F.Supp. 1567, 1569 (1990), quoting *Powell v. McCormack*, 395 U.S. 486, 496, 89 S.Ct. 1944, 1950, 23 L.Ed.2d 491 (1969). This is true of TRES, and defendant's motion to dismiss it from action No. 87–01–00022 must therefore be denied.

## II

The issues in action No. 87–01–00022 concern a business practice of TRES and Cinsa (and apparently of other manufacturers and exporters in Mexico[5]) which grew out of that country's foreign-exchange-control laws. In December 1982, the government of Mexico established a system of dual exchange rates: the official, or controlled rate, which had to be used in all export and most import transactions, and a free rate, which, according to a memorandum in the record, was to be used for tourism and transactions along the border[6]. Every business exporting goods exceeding one million U.S. dollars in value was further required to bring underlying invoice(s) to a bank prior to export for issuance of a certificate for the sale of foreign exchange (*compromiso de ventas de divisas* or "CVD") indicating that that sale was subject to the exchange controls of Mexico and dollars earned on the sale had to be repatriated within 90 days of its issuance for exchange at the official rate.[7]

## A

During ITA verification, TRES and Cinsa explained that their U.S. customers would deposit money due in interest-bearing accounts in the United States. Eventually, the monies would be converted by plaintiffs' Mexican banks at the official rates in effect 90 days after issuance of the CVD's, thereby liquidating them. *See* R.Doc 112, p. 23; R.Doc 118, p. 23. Because of depreciation of the peso vis-à-vis the dollar, this practice resulted in receipt by TRES and Cinsa of more pesos than would have been received had the sales proceeds been repatriated earlier. According to the verifica-

---

**4.** *See, e.g., McKechnie Bros. (N.Z.) Ltd. v. U.S. Dep't of Commerce*, 14 CIT ——, 735 F.Supp. 1066 (1990); *Fabricas El Carmen, S.A. de C.V. v. United States*, 12 CIT 129, 680 F.Supp. 1577 (1988); *PPG Industries, Inc. v. United States*, 11 CIT 303, 660 F.Supp. 965 (1987).

**5.** *See, e.g.,* TRES/Cinsa Memorandum, p. 6; Record Document ("R.Doc") 130.

**6.** *See* R.Doc 114, Exhibit A, p. 27.

**7.** *See* R.Doc 112, pp. 22–23; R.Doc 118, p. 23. According to papers filed with the ITA, however, the 90-day deadline merely fixed the rate of exchange as of the 90th day so that exporters exchanging after that day did not receive the benefit of any further devaluation of the peso. R.Doc 115, p. 61, n. 1; R.Doc 116, p. 51, n. 1. Moreover, it has now been reported that the government of Mexico has dropped this form of exchange control altogether. *See* 8 Int'l Trade Rep. (BNA) 1664 (Nov. 13, 1991).

tion reports, Cinsa allocated the gains on a per-sale basis, while TRES's allocation was based on an average calculation. *See* ConfDoc 30, pp. 23–24; ConfDoc 35, p. 24.

Initially, the gains were claimed as a credit-expense adjustment to U.S. price. *See, e.g.*, ConfDoc 2, pp. 12–13; R.Doc 30, pp. 18–19; R.Doc 31, p. 14. TRES and Cinsa then proposed three alternative methodologies for taking the gains into account: use of the free rate of exchange to convert as of the date of sale, use of the official rate on the 90th day, or a circumstances-of-sale adjustment pursuant to 19 C.F.R. § 353.15(a) (1986).

The ITA rejected a free-rate approach, stating that "[f]irms must convert their foreign exchange to Mexican pesos at the official exchange rate. Therefore, we converted at the certified official rate in effect on the date of sale." 51 Fed.Reg. at 36,-440. Rejecting any other adjustment for the post-sales gains, the agency stated:

> While respondents may have received more pesos for their dollar earnings by waiting 90 days to repatriate those dollars, the purchasing power of those pesos would have been diminished by inflation that occurred in Mexico during that 90 day period. Therefore, if we were to allow these foreign exchange gains, without any adjustment for the diminishing purchasing power of the pesos, we would be overstating the return to the Mexican producers. Because changes in inflation and devaluation rates would, in general,

be parallel, we would not anticipate the effect of the 90 day delay to be significant. Moreover, we verified that the change in the exchange rate was not predictable.

*Id.* at 36,438. Cinsa's margin was determined to be 17.47 percent; for TRES it was 58.73. *See id.* at 36,442.

Plaintiffs' position is that these margins are inflated as a result of the ITA's failure to discount their exchange gains.

### B

■ As indicated, the agency made all currency conversions as of the dates of sale in accordance with 19 C.F.R. § 353.56(a), which stated:

> (a) *Rule for conversion.* In determining the existence and amount of any difference between the United States price and the fair value or foreign market value for the purposes of this part or of the Act, any necessary conversion of a foreign currency into its equivalent in United States currency shall be made in accordance with the provisions of section 522 of the Tariff Act of 1930, as amended (31 U.S.C. 372):
>
> (1) As of the date of purchase or agreement to purchase, if the purchase price is an element of the comparison....[8]

The plaintiffs argue that the agency should have chosen the certified free rates rather than the controlled rates as of the dates of

---

**8.** This section has been renumbered 353.60(a). *See* 54 Fed.Reg. 12,742, 12,789 (March 28, 1989). Section 372, currently codified at 31 U.S.C. § 5151, states, in part:

(c) Except as provided in this section, conversion of currency of a foreign country into United States currency for assessment and collection of duties on merchandise imported into the United States shall be made at values published by the Secretary under subsection (b) of this section for the quarter in which the merchandise is exported.

(d) If the Secretary has not published a value for the quarter in which the merchandise is exported, or if the value published by the Secretary varies by at least 5 percent from a value measured by the buying rate at noon on the day the merchandise is exported, the conversion of the currency of the foreign country shall be made at a value—

(1) equal to the buying rate at noon on the day the merchandise is exported; or

(2) prescribed by regulation of the Secretary for the currency that is equal to the first buy-rate certified for that currency by the Federal Reserve Bank of New York under subsection (e) of this section in the quarter in which the merchandise is exported, but only if the buying rate at noon on the day the merchandise is exported varies less than 5 percent from the buying rate first certified.

In this matter, both the free rate and official Mexican controlled rate were certified. *See, e.g.*, R.Doc 115, p. 60; R.Doc 116, pp. 50–51. Because there was a variance of more than five percent, the ITA used daily rates to convert from pesos into dollars. *See* 51 Fed.Reg. at 36,437.

sale because the free rates more closely approximated the official rates 90 days later. They rely on *Pistachio Group of the Ass'n of Food Indus. v. United States*, 11 CIT 668, 671 F.Supp. 31 (1987), and *Luciano Pisoni Fabbrica Accessori Instrumenti Musicali v. United States*, 10 CIT 424, 640 F.Supp. 255 (1986), claiming that the ITA's reliance on section 353.56(a) was an abuse of discretion.

In *Pistachio Group*, the court remanded for agency determination of whether use of the rate certified by the Federal Reserve, the official Iranian government rate, artificially created a margin of dumping [9], having upheld section 353.56's delegation of authority to the Federal Reserve. The court concluded that

> the policies of the antidumping law require that ITA's residual discretion include the ability to avoid error in cases where the N.Y. Fed has chosen an incorrect exchange rate. Our Court of Appeals has recognized that findings of LTFV sales are not appropriate when they result solely from the misapplication of exchange rates. In *Melamine Chemicals*, the court upheld ITA's use of a 90–day lag rule for selecting exchange rates and stated:
>
> > Though the CIT noted that the United States had cited "no authority for using a 90 day lag rule", that authority stems from *Commerce's duty to enforce fairly the antidumping laws by determining whether LTFV sales are or are not occurring.* The purpose of the antidumping law, as its name implies, is to discourage the practice of selling in the United States at LTFV by the imposition of appropriately increased duties. That purpose would be ill-served by application of a mechanical formula to find LTFV sales, and thus a violation of the antidumping laws, where none existed. A finding of LTFV sales based on a margin resulting solely from a factor beyond

the control of the exporter would be unreal, unreasonable, and unfair.

11 CIT at 676–77, 671 F.Supp. at 38 (emphasis in original, citations omitted). The court in *Luciano Pisoni* also remanded, stating that "the purpose of the antidumping laws would be violated if Commerce found a dumping margin based on the use of quarterly rates, while no margin would result if Commerce were to use the rates prevailing at the time of transactions." 10 CIT at 430, 640 F.Supp. at 260–61.

The defendant and the intervenor-defendant respond herein that plaintiffs' reliance on *Luciano Pisoni* and also on *Melamine Chemicals, Inc. v. United States*, 732 F.2d 924 (Fed.Cir.1984), is misplaced because those decisions were based on subsection (b) of 353.56, the exception to the general rule set forth in section 353.56(a). But as pointed out in *Pistachio Group* in response to an identical argument, "it would be shortsighted to confine the Court of Appeals' guidance to [subsection (b)] at issue in *Melamine*." 11 CIT at 677, 671 F.Supp. at 38:

> An improper exchange rate will distort an LTFV determination, regardless of whether it results from an error in calculation, or the selection of a valid rate from an improper period in time, or from the type of problems which may exist here. In any case, the agency must exercise its residual discretion to ensure that LTFV sales have actually been made.

*Id.* Cf. *Luciano Pisoni Fabbrica Accessori Instrumenti Musicali v. United States*, 10 CIT at 430, 640 F.Supp. at 260–61.

In this action, in the exercise of such discretion, the ITA applied daily rather than quarterly rates, relying on the numbers officially set by Mexico which, of course, governed TRES and Cinsa. *Cf.* R.Doc 112, pp. 22–23; R.Doc 114, Exhibit A, p. 27; R.Doc 118, pp. 20, 22, 23. And there is support in the record and in the law for this approach.

---

**9.** The official rate was 90 rials to one U.S. dollar; the "free" rate 600–650. Both sides agreed that, had the ITA been able to verify that the latter rate had been used, "it would have been possible to conclude that artificial dumping margins were created by utilization of the official rate". *Pistachio Group of the Ass'n of Food Indus. v. United States*, 12 CIT 416, 417, 685 F.Supp. 848, 849 (1988).

## C

■ Alternatively, the plaintiffs at bar argue that the agency should have taken the increased peso returns into account by applying the official rates in effect 90 days after the dates of sale, citing 19 C.F.R. § 353.56(b). The defendant counters that TRES and Cinsa never argued either that the peso's depreciation was rapid and therefore application of that subsection was appropriate or that use of the controlled rate on the 90th day was reasonable. Therefore, the defendant argues, the court cannot consider these issues.

An examination of the record, however, suggests that TRES and Cinsa did raise the points. For example, in their post-verification briefs, they requested selection of the "controlled rate of exchange with adjustment [to fair value] for the foreign exchange earnings, resulting from devaluation of the Mexican peso"[10], arguing that "failure to make the currency adjustment w[ould] result in a situation where the remaining margin was due *solely to the ITA's failure to take the currency exchange fluctuations into account*." R.Doc 115, p. 70 (emphasis in original). *See also id.* at 63–68, 69–75; R.Doc 116, pp. 53–58, 60–65. They also took the position that, if the ITA were to use the controlled rates, it should "grant an adjustment to fair value to properly reflect the actual rate of exchange". R.Doc 115, p. 60; R.Doc 116, p. 51. *Cf.* ConfDoc 47, p. 2, para. 5. While TRES and Cinsa did not explicitly state that conversion at the controlled rates 90 days after their sales pursuant to section 353.56(b) was required because of the peso's devaluation, they did request an adjustment if the agency were to rely on the controlled rates. In short, the plaintiffs are not barred from pursuing this issue now.

Section 353.56(b) of 19 C.F.R. stated at the time:

*Special rules for fair value investigations.* For purposes of fair value investigations, manufacturers, exporters, and importers concerned will be expected to act within a reasonable period of time to take into account price differences resulting from sustained changes in prevailing exchange rates. Where prices under consideration are affected by temporary exchange rate fluctuations, no differences between the prices being compared resulting solely from such exchange rate fluctuations will be taken into account in fair value investigations.

The decision of the Federal Circuit in *Melamine Chemicals, Inc. v. United States, supra,* reports ITA perception of the purpose and application of this section as follows:

... Antidumping investigations are meant to determine whether prices of merchandise sold in the United States are at less than "fair value." When exchange rates are fluctuating substantially, a given dollar price of a product in the United States could change technically from fair to "unfair" literally from day to day, even if the foreign price of a product, denominated in the foreign currency, also remained constant. This result is not called for by the language or purpose of the Act. It would be unrealistic to expect businesses to change prices instantaneously to take account of fluctuating exchange rates....

The regulation, then, allows a reasonable period in which the business may take sustained exchange rate fluctuations into account. The regulation further instructs that temporary fluctuations should not be the sole basis for determinations of less than fair value sales. Businesses are to be given time to assess whether one currency has truly appreciated against another before changing their pricing practices.

732 F.2d at 932, quoting 45 Fed.Reg. at 29,620.

In this action, the parties seem to agree that the peso was not undergoing temporary fluctuations during the period of investigation[11]. Rather, the peso's deprecia-

---

**10.** R.Doc 115, p. 63; R.Doc 116, pp. 53–54.

**11.** *See, e.g.,* Plaintiffs' Memorandum, p. 25 ("exchange rate changes in the instant case were sustained rather than volatile"); Defendant's

tion vis-à-vis the dollar appears to have been relatively steady. *See* R.Doc 76, Chart Two; Defendant's Memorandum, Exhibits A and B. *See also* R.Doc 130. In such a situation, the ITA has required a showing that some sort of adjustment has been made "to account for movement in the exchange rate." *E.g., Final Determination of Sales at Less Than Fair Value; Certain Internal–Combustion, Industrial Forklift Trucks From Japan,* 53 Fed.Reg. 12,552, 12,555 (April 15, 1988). *See also NTN Bearing Corp. of America v. United States,* 14 CIT ——, ——, 747 F.Supp. 726, 734 (1990); *Toho Titanium Co. v. United States,* 14 CIT ——, ——, 743 F.Supp. 888, 892–93 (1990).

The plaintiffs claim that they are entitled to application of section 353.56(b) because they adjusted their home-market prices. But the record indicates that those prices were raised in response to the inflation rather than to account for the loss of value on the part of the peso. *See* ConfDoc 10, p. 4; ConfDoc 33, p. 76; ConfDoc 34, p. 66. While it might be prudent to increase prices in an inflationary market, to do so at a time when that market's currency is depreciating against another currency while keeping export prices constant tends to increase margins.

In any event, the plaintiffs have not established that the margins they contest herein were caused by factors beyond their control, and the court thus concludes that the ITA's reliance on subsection (a) rather than (b) of 19 C.F.R. § 353.56 is supported by substantial evidence on the record and in accordance with law.

### D

■ That law requires the agency to make a "fair comparison" between foreign-market value and U.S. price. *E.g., Budd Company, Wheel & Brake Div. v. United*

Memorandum, p. 7, n. 6; Intervenor–Defendant's Brief, p. 19.

The defendant argues that section 353.56(b) is only applied in cases of sustained appreciation. While it apparently is true that the ITA generally does not apply this section to depreciation, which tends to decrease margins, there is nothing in the statute, the regulation or their history

*States,* 14 CIT ——, ——, 746 F.Supp. 1093, 1099 (1990), citing *Smith–Corona Group, Consumer Products Div., SCM Corp. v. United States,* 713 F.2d 1568, 1578 (Fed. Cir.1983), *cert. denied,* 465 U.S. 1022, 104 S.Ct. 1274, 79 L.Ed.2d 679 (1984). To facilitate that comparison, 19 U.S.C. § 1677b(a)(4) authorizes an adjustment to foreign-market value in the "amount of any difference between the United States price and the foreign market value ... wholly or partly due to ... (B) other differences in circumstances of sale". The implementing regulation stated, in part:

> *In general.* In comparing the United States price with the sales, or other criteria applicable, on which a determination of foreign market value is to be based, reasonable allowances will be made for bona fide differences in the circumstances of the sales compared to the extent that it is established to the satisfaction of the Secretary that the amount of any price differential is wholly or partly due to such differences. Differences in circumstances of sale for which such allowances will be made are limited, in general, to those circumstances which bear a direct relationship to the sales which are under consideration.

19 C.F.R. § 353.15(a) (1986). Congress cautioned however:

> ... [I]f adjustments are improperly made, the result may be an unjustifiable reduction in or elimination of the dumping margin. Therefore, ... adjustments should be permitted if they are reasonably identifiable, quantifiable, and directly related to the sales under consideration and if there is clear and reasonable evidence of their existence and amount.

H.R.Rep. 317, 96th Cong., 1st Sess. 76 (1979). *Cf. Rhone Poulenc, S.A. v. United States,* 8 CIT 47, 65–66, 592 F.Supp. 1318, 1334–35 (1984).

which suggests such a limitation was intended. Conceivably, proper circumstances for the application of section 353.56(b) to depreciating currency can arise. *Cf. Luciano Pisoni Fabbrica Accessori Instrumenti Musicali v. United States,* 10 CIT 424, 640 F.Supp. 255 (1986). Hence, the court declines to interpret the law in such a manner now.

TRES and Cinsa argued in support of adjustment that they were able to reduce their base U.S. prices by an amount equal to their exchange earnings because those earnings were predictable and quantifiable. *See, e.g.,* R.Doc 55, p. 4; 51 Fed.Reg. at 36,438. GHC responded that the Act and the regulations preclude such an adjustment, and that, even if not precluded by law, it would be inappropriate to make an adjustment in this matter. 51 Fed.Reg. at 36,438.

The ITA did not accept that those earnings were predictable, and the defendant now argues that unpredictable exchange gains could not have been factored into U.S. prices and therefore the plaintiffs cannot establish a link between such gains and pricing of the sales under consideration.[12]

The plaintiffs contend that verification of the amounts of increased revenue on each sale did establish such a link.[13] However, while they quantified, and the ITA verified, the amounts of the exchange-rate gains on a transaction-by-transaction basis, the plaintiffs also had to show that the differences between their home-market and U.S. prices were due wholly or partly to increased revenues on their U.S. sales—the "necessary causal link between the differences in price and differences in circumstances of sale"[14]—and that the increased revenues were directly related to the sales at issue. *See* 19 C.F.R. § 353.15(a).

On this point, the plaintiffs have not established that such revenues herein were directly reflective of their pricing strategy. At verification, they had been instructed to be

> prepared to show that the U.S. export prices on the products under investigation were reduced from their original amounts by the same amount as the exchange rate gain.
>
> Provide documentation (internal memos, calculation sheets, etc.,) showing all assumptions made in the setting of U.S. prices.

R.Doc 89, p. 8. Nonetheless, there is little in the record suggesting that TRES or Cinsa came forward with such information.[15]

They do contend that the "ITA has in numerous cases granted circumstance of sale adjustments when the respondent has quantified its increased revenue on sales in one market and tied such increased revenues to the sales of the subject merchandise." Plaintiffs' Memorandum, p. 38. They rely on *Final Determination of Sales at Less than Fair Value: Antifriction Bearings (Other Than Tapered Roller Bearings) and Parts Thereof From the Federal Republic of Germany,* 54 Fed. Reg. 18,992 (May 3, 1989); *Certain Welded Carbon Steel Standard Pipe and Tube From India; Final Determination of*

---

**12.** The plaintiffs reply that the ITA "improperly denied the adjustment for failure to prove a difference in price *within* the export market, *e.g.,* a difference between Plaintiffs' original U.S. prices and such prices after a reduction to reflect the currency exchange gain." Plaintiffs' Reply Brief, p. 44 (emphasis in original). They claim that the "difference for which an adjustment is sought is a difference between the circumstance of sale between the home market and the export market." *Id.*

As the court construes defendant's position, however, what is pointed to is a failure by the plaintiffs to establish that the exchange-rate gains were a cause of the price differences, as required by 19 U.S.C. § 1677b(a)(4) and 19 C.F.R. § 353.15(a).

**13.** They also contend that all argument beyond the ITA's conclusions regarding inflation amount to *post-hoc* rationalization. But the court finds that the agency's position on the predictability of exchange rates directly con-

cerns the appropriateness of a circumstances-of-sale adjustment. Moreover, "where the court c[an]not find support in the record upon which ITA could allow this adjustment, further explanation from ITA would not be helpful." *Ipsco, Inc. v. United States,* 12 CIT 384, 397 n. 13, 687 F.Supp. 633, 643 n. 13 (1988).

**14.** *Brother Industries v. United States,* 3 CIT 125, 129–30, 540 F.Supp. 1341, 1349 (1982), *aff'd sub nom. Smith–Corona Group, Consumer Products Div., SCM Corp. v. United States,* 713 F.2d 1568 (Fed.Cir.1983), *cert. denied,* 465 U.S. 1022, 104 S.Ct. 1274, 79 L.Ed.2d 679 (1984). *See also Rhone Poulenc, S.A. v. United States,* 8 CIT 47, 66, 592 F.Supp. 1318, 1334–35 (1984).

**15.** In fact, the record indicates that the plaintiffs kept their U.S. prices constant during the period of investigation. *See* ConfDoc 2, App. C, pp. 20–21; ConfDoc 3, p. 2; ConfDoc 22, p. 14; ConfDoc 23, p. 13. *Cf.* R.Doc 112, p. 29; R.Doc 118, p. 24.

*Sales at Less Than Fair Value*, 51 Fed. Reg. 9069 (March 17, 1986), *aff'd sub nom. Sawhill Tubular Div. Cyclops Corp. v. United States*, 11 CIT 491, 666 F.Supp. 1550 (1987); and *Final Determination of Sales at Less Than Fair Value; Certain Electrical Conductor Aluminum Redraw Rod from Venezuela*, 53 Fed.Reg. 24,755 (June 30, 1988).

Each of the referenced determinations, however, was based on a finding of "direct relationship". In *Antifriction Bearings*, the exporter requested an adjustment to "reflect the difference between ... actual return on ... U.S. sales and the theoretical return that results from using the Federal Reserve exchange rate on the date of sale." 54 Fed.Reg. at 19,085. The ITA granted relief for sales in 1987 per the following reasoning:

> To demonstrate that hedging has affected the actual exchange rate that it has received for its sales, a respondent must show the Department the actual exchange contracts that it entered into and demonstrate that these contracts are tied directly to the sales that took place during the period of investigation. In addition, the respondent must then accurately report the exchange rate that it received on these sales and include this information in its listing of individual sales and adjustments.[16]

Similarly, in *Certain Welded Carbon Steel Pipe and Tube From India*, the ITA granted a circumstances-of-sale adjustment for revenues attributable to the International Price Reimbursement Scheme, a rebate equal to the difference between the cost of steel in India and its cost on the world market. *See* 51 Fed.Reg. at 9,090. The agency found the rebate "directly related to, and in fact contingent upon, the export sale of the merchandise under investigation. Receipt of the IPRS effectively enhanced the net return ... on those sales." *Id.* at 9,091. Finally, in *Certain Electrical Conductor Aluminum Redraw Rod from Venezuela*, the respondent received export bonds which it recorded as revenue. As the firm had no home-market sales during

the period of investigation, the agency used third-country sales for the US-price-to-foreign-market-value comparison. *See* 53 Fed. Reg. at 24,757. This comparison required an adjustment for the difference in the value of the bonds received on U.S. sales and the value received on third-country sales, as "it is [Commerce's] consistent practice to adjust foreign market value for export payments that are directly related to the production and/or sale of the products under investigation, and which are recorded in the financial records of the exporter." *Id.* at 24,760.

The plaintiffs also rely on *Amended Final Determination of Sales at Less than Fair Value and Amended Antidumping Duty Order; Tubeless Steel Disc Wheels From Brazil*, 53 Fed.Reg. 34,566 (Sept. 7, 1988), stating that the "ITA's final determination was also inconsistent with the ITA's circumstance of sale adjustments to remedy potential problems in the LTFV calculations attributable to unique economic circumstances in the home market." In that proceeding, the ITA constructed foreign-market value on a monthly basis as of the date of shipment rather than the date of sale to account for Brazilian hyperinflation, comparing that value with U.S. price on the date of sale. Currency conversions were made as of that date. Because of the rapid devaluation of the cruzeiro and the fact that sales occurred more than a month before dates of shipment, the agency adjusted foreign-market value to eliminate "artificial distortion of value" but limited the adjustment to "cases where the foreign market value is based upon monthly constructed values because of hyperinflation during the period of investigation and the date of sale occurs in a calendar month preceding the date of exportation." *Id.* In affirming, the Court of International Trade stated that

> it was appropriate for Commerce to choose to effectuate the primary statutory purpose in favor of fair determinations based on contemporaneous comparisons. It would appear that were Com-

---

**16.** Relief was denied for 1988 for failure to meet this test.

merce to do otherwise, dumping margins would result solely from the application of exchange rates, a circumstance which was wholly beyond the control of the exporters, an unacceptable outcome.

*Budd Company, Wheel & Brake Div. v. United States.*[17] The court held that it was the agency's construction of foreign-market value and the Brazilian economy which created the distortion of value therein. *See* 14 CIT at ——, 746 F.Supp. at 1102.

The record before this court does not indicate inflation of the kind apparently afflicting Brazil. TRES referred to a rate of 30.31 percent during the period of investigation and 63.70 for all of 1985. *See* R.Doc 31, p. 11. The verification report on that company referred to a rate of 3.5 percent for July. *See* ConfDoc 35, p. 28. A U.S. State Department financial attache confirmed that number for July and 4.4 percent in August and 4.0 for September. *See* R.Doc 114, Exhibit A, p. 12. TRES and Cinsa claimed after verification that the rate was more than 43 percent during the period of investigation[18], while the ITC's preliminary determination had stated that "Mexico's higher inflation rate relative to that in the United States offset the impact of depreciating nominal exchange rates during most of the period." R.Doc 12, p. A–24. *See also* R.Doc 133, p. A–26. Whatever the actual rate, the defendant argues that a higher number would only serve to increase plaintiffs' exchange-rate loss. *See* Defendant's Memorandum, pp. 45–47.

The plaintiffs counter that "circumstances of sale adjustments have been granted in numerous instances and the amount of the adjustment has never before been 'offset' by an amount corresponding to the rate of inflation." Plaintiffs' Reply Brief, p. 38. However, the ITA has broad discretion in making adjustments to foreign-market value under 19 U.S.C. § 1677b(a)(4)(B) and 19 C.F.R. § 353.15 (1986). *See, e.g., Smith–Corona Group, Consumer Products Div., SCM Corp. v. United States,* 713 F.2d at 1575; *Budd Company, Wheel & Brake Div. v. United States,* 14 CIT at ——, 746 F.Supp. at 1103; *Rhone Poulenc, S.A. v. United States,* 8 CIT at 65, 592 F.Supp. at 1334. And the court may not weigh the evidence concerning specific factual findings, nor may it substitute its judgment for that of the agency.

Suffice it to state that, on the record at bar, the court is not persuaded that the agency's denial of a circumstances-of-sale adjustment was either unsupported by substantial evidence or not in accordance with law.

### III

The defendant does acquiesce in remand of Count 7 of the complaint filed by TRES and Cinsa, which challenges the ITA's denial of such an adjustment for related-party commission expenses, "to re-examine the issue in light of recent administrative determinations by the agency." Defendant's Memorandum, p. 2. Nevertheless, such de-

---

17. 14 CIT at ——, 746 F.Supp. at 1100 (citations omitted). The court distinguished *Negev Phosphates, Ltd. v. United States,* 12 CIT 1074, 699 F.Supp. 938 (1988), and *LMI–La Metalli Industriale, S.p.A. v. United States,* 13 CIT 305, 712 F.Supp. 959 (1989), *aff'd in part, rev'd in part,* 912 F.2d 455 (Fed.Cir.1990). In *Negev,* the Israeli government granted rebates for "differences in exchange rates vis a vis inflation". The plaintiffs challenged the ITA's finding that additional revenues received as a result of that subsidy were not directly related expenses under section 353.15. The court concluded that the agency's denial was a reasonable exercise of its discretion:

... [T]he EIS receipts do not account for any difference in the prices of the sales that Com-

merce compared. The price that Negev charged its United States and home market purchasers for its product was not affected by the EIS payments. Negev simply received a rebate payment of purchase price from its government after the date of payment by the United States purchaser.

12 CIT at 1080, 699 F.Supp. at 945. In *LMI,* an adjustment to account for currency hedging expenses related to purchase of raw materials had been denied because they could not be "directly tied to the sales under investigation". *Final Determination of Sales at Less Than Fair Value: Brass Sheet and Strip From Italy,* 52 Fed.Reg. 816, 818 (Jan. 9, 1987).

18. *See* R.Doc 115, p. 77; R.Doc 116, p. 67.

terminations by the ITA, covering TRES and Cinsa, have made this count moot.

■ The defendants have also filed a motion to remand GHC's action, No. 87–01–00020, stating that they have determined that they "did not follow the proper practice during the investigation with respect to the manner in which Commerce calculated foreign market value." However, this court must consider *sua sponte* whether or not that action has become moot if it is to function within its constitutional sphere of authority. *North Carolina v. Rice*, 404 U.S. 244, 246, 92 S.Ct. 402, 404, 30 L.Ed.2d 413 (1971). GHC states in the first paragraph of its complaint that the "portions of the administrative determination which [it] seeks to reverse had the effect of lowering the final dumping margins determined by the ITA." GHC's subsequent motion for judgment on the agency record further narrows its challenge of the ITA's determination to use only of home-market sales to wholesalers in the agency's contemplation of the foreign-market value and to a conclusion that Cinsa's home-market sales of roasters were insufficient in that context. In short, GHC's action is one wherein "the relief sought, and the issues raised thereby, are tied inextricably to duties on particular entries." *Nuove Industrie Elettriche di Legnano S.p.A. v. United States*, 14 CIT at ——, 739 F.Supp. at 1570. That is, the later administrative-review results have mooted entitlement to that relief, and action No. 87–01–00020 thus must be dismissed.

Judgments will enter accordingly in both actions covered by this opinion.