Slip Op. 04 - 71

# *UNITED STATES COURT OF INTERNATIONAL TRADE*

|  |  |  |
| --- | --- | --- |
| VALKIA LIMITED, | : | |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | **Before: MUSGRAVE, JUDGE** |
| | : | |
| UNITED STATES, | : | Court No. 02-00249 |
| | : | |
| Defendant, | : | |
| | : | |
| and | : | |
| | : | |
| CARPENTER TECHNOLOGY CORP.; | : | |
| CRUCIBLE SPECIALTIES METALS DIV. | : | |
| CRUCIBLE METALS CORP.; | : | |
| ELECTROALLOY CORP.; SLATER STEELS | : | |
| CORP., FORT WAYNE SPECIALTY ALLOYS | : | |
| DIVISION; and THE UNITED STEEL | : | |
| WORKERS OF AMERICA, AFL-CIO/CLC, | : | |
| | : | |
| Defendant-Intervenors. | : | |
| | : | |

[Plaintiff exporter argues error in successorship finding at antidumping duty investigation; plaintiff's USCIT Rule 56.2 motion denied, final determination by Commerce Department sustained.]

Decided: June 18, 2004

*Cameron & Hornbostel LLP*, Washington DC (*Alexander W. Sierck*, *Matthew J. Martin*, *Mark D. Davis* and *Valerie Ellis*), for the plaintiff.

*Peter D. Keisler*, Assistant Attorney General; *David M. Cohen*, Director, Civil Division, Commercial Litigation Branch, United States Department of Justice (*A. David Lafer*, *Stephen Carl Tosini*); Office of Chief Counsel for Import Administration, U.S. Department of Commerce (*James K. Lockett*), of counsel, for the defendant.

*Collier Shannon Scott, PLLC* (*Robin H. Gilbert*), Washington, D.C., for the defendant-intervenors.

# OPINION

After being selected as a "mandatory" respondent in the investigation of stainless steel bar ("SSB") from the United Kingdom, Crownridge Stainless Steels Limited decided to liquidate. *See Notice of Final Determination of Sales at Less Than Fair Value: Stainless Steel Bar From the United Kingdom*, 67 Fed. Reg. 3146 (Jan. 23, 2002). *See* Public Record ("PDoc") 162; *see also Antidumping Duty Order: Stainless Steel Bar from the United Kingdom*, 67 Fed. Reg. 10381 (Mar. 7, 2002), PDoc 165. Valkia Limited purchased most of Crownridge's assets from the company's liquidator. During the investigation, the International Trade Administration ("ITA"), United States Department of Commerce ("Commerce" or "the Department") essentially concluded that Crownridge and Valkia had schemed to avoid responding to requests for information, which warranted an adverse inference in selecting from facts otherwise available.[1] Commerce therefore determined to impose antidumping duties of 125.77 percent margin against "Crownridge/Valkia."

Valkia brings this suit contending that an adverse inference is not warranted because neither Crownridge's directors nor its liquidator had the legal authority to respond to Commerce's antidumping questionnaire once the company entered liquidation. Valkia also argues that Commerce's successor-in-interest test is unlawful as applied in this matter. The government and the defendant-intervenors contend that the final determination should be sustained as is. On the reasoning below, the Court sustains the final determination with respect to Valkia.

---

[1] In a proceeding such as this, a determination on the margin must be made. Commerce will therefore use "facts otherwise available" where information necessary for a determination is not on the record. *See* 19 U.S.C. § 1677e(a). If "an interested party has failed to cooperate by not acting to the best of its ability to comply with a request for information" then Commerce "may use an inference that is adverse to the interests of that party in selecting from among the facts otherwise available" which may include information from the petition. 19 U.S.C. § 1677e(b).

## *Background*

On December 28, 2000, the petitioners filed an allegation of dumping of stainless steel bar ("SSB") from countries including the United Kingdom,[2] which Commerce began to investigate on January 2, 2001. *Notice of Initiation of Antidumping Duty Investigations: Stainless Steel Bar from France, Germany, Italy, Korea, Taiwan, and the United Kingdom*, 66 Fed. Reg. 7620 (Jan. 24, 2001), PDoc 17. On February 12, 2001, Commerce identified Crownridge as one of the three largest producers or exporters of stainless steel bar ("SSB") from the United Kingdom and therefore made it a mandatory respondent to the investigation. *See Notice of Preliminary Determination of Sales at Less Than Fair Value and Postponement of Final Determination*, 66 Fed. Reg. 40192 (Aug. 2, 2001), PDoc 109 ("*Preliminary Determination*"); PDoc 31.

Immediately, on February 13, 2001, counsel for Crownridge informed Commerce that due to "the uncertainties presented by the pending antidumping investigation" and ongoing financial difficulties, the "members" of Crownridge had previously resolved to liquidate the company as of February 6, 2001. *See* Memorandum to File re: Liquidation of Crownridge (Commerce, July 5, 2001), PDoc 91 ("*Liquidation Memo*"), at Att. 2. Nonetheless, on February 20, 2001, Commerce sent Part A of the antidumping duty questionnaire to Crownridge concerning their respective SSB sales in the U.S. and the U.K. over the period October 1, 1999 to September 30, 2000 (the "POI"). PDoc 38. Whether it expected a response to that, on February 26, 2001, Commerce contacted

---

[2] Confidential Record Document 1. When a dumping petition is filed, Commerce is required to determine whether imported merchandise is being or is likely to be sold in the United States at less than its fair value, *i.e.*, the amount by which the price charged for subject merchandise in the home or other comparative market (the "normal value") exceeds the price charged for subject merchandise in the United States (the "U.S. price"). 19 U.S.C. §§ 1673(1), 1677(35).

personnel at the U.S. Foreign Commercial Service ("USFCS") in London to ask them for follow-up

information on the Crownridge liquidation. Specifically, an ITA financial analyst asked whether

> any of you know whether Crownridge was: 1. Liquidated piecemeal (*i.e.*, its various capitol [*sic*] assets sold by [the accounting firm handling the liquidation] to several different companies? - or - 2. Liquidated wholly to one/few investors who can/are operating Crownridge's facilities as a different legal entity, but basically in the same manner as before the liquidation?

*Liquidation Memo* at Att. 4 (e-mail of Feb. 26, 2001). USFCS personnel e-mailed back to the ITA

analyst that "[t]he official liquidator of Crownridge . . . as a result of my call to him[ is] checking

to see whether any of the assets of the now-defunct company are still in productive use, either as a

continuation of the former enterprise or as a subsidiary of another firm." *Id*. By e-mail of February

28, 2001, the USFCS personnel subsequently reported that:

> [The liquidator] confirms that the Crownridge . . . plant at Milford Haven, Pembroke, Wales is no longer in operation, and that they are now seeking a buyer for the site, plant and machinery. According to [the liquidator], Crownridge was a small independent steel producer, running at a loss when the US anti-dumping investigation was initiated. The company's financial backers took legal advice, and when informed that the cost of defending the company's position in the United States was likely to be in excess of half a million pounds, they withdrew their financial support. Crownridge contends that the U.S. anti-dumping investigation was the event that tipped the company over the edge, and [the liquidator] believes that the inclusion of Crownridge in the anti-dumping petition has proved to be a "red flag" to potential new investors.

*Id*. at Att. 4.

On March 29, 2001, counsel for Crownridge faxed to Commerce copies of the February 6,

2001 extraordinary resolution passed by Crownridge's members, the February 6, 2001 appointment

of the liquidator of Crownridge pursuant to the Insolvency Act 1986 of the United Kingdom, and a

copy of a published notice to that effect. *Id*. at Att. 3. On April 3, 2001, the USFCS e-mailed the

ITA analyst concerning the then-current status of the Crownridge plant and reiterated: "No valid offers have been received by the liquidator; the plant is completely closed down, and there is no stockpiled product that could be sold or exported." *Liquidation Memo* at Att. 1.  The ITA analyst apparently made a further request for updated information, and on April 18, 2001, USFCS personnel reported:

> Further to my 02/28 e-mail, the capital assets of Crownridge are still available for disposal from the liquidator.  No serious offers have been received since the company opted to liquidate, and none are expected.  The liquidator . . . blames the U.S. anti-dumping investigation for this sad situation, informing us that Crownridge's lawyers' assessment of the likely cost of defending the anti-dumping action caused whatever withdrawal of the company's original financial backers, and that the continued action has effectively killed off any prospect of a rescue by other firms.  The probable outcome is a write-off of the Crownridge assets, leaving a derelict brownfield site and some scrap machinery.  There is no prospect of any change in circumstances, and nothing further that we can do to help you with your inquiries.  Please let me know if this information is sufficiently final to close the books on the Crownridge affair.

*Id*.

On June 15, 2001, a Commerce staff member sent an e-mail to Rhodri Phillips, who had been a member of Crownridge's board of directors prior to its liquidation and (as it turned out) one of two principal investors who had been negotiating with the liquidator to purchase the Crownridge assets from bankruptcy. *See id*. at Att. 5.  The e-mail explained the  Commerce was in the process of investigating dumping of SSB from the U.K., that Crownridge was named as a mandatory respondent, and that Commerce had sent

> your company a questionnaire (attached), via Federal Express, soliciting certain sales and cost information to be used in our antidumping duty analysis of your company.  Your company's response to this questionnaire was due by March 29, 2001.  However, to date we have not received any communication from you regarding this matter.

> Although we understand from . . . Crownridge's former counsel in this matter that your company is currently undergoing liquidation, we wish to advise you that your *failure to respond* to the Department's questionnaire may result in the *use of facts available* under section 776 of the Tariff Act of 1930, as amended, in making our antidumping determination with respect to your company. Should you decide to respond to the attached questionnaire, you must do so no later than June 25, 2001. Given the statutory time constraints in this proceeding, we may not be able to consider your response in making our preliminary determination currently due on July 26, 2001, but may do so for the purposes of our final determination. . . .

*Id*. (highlighting added).

Commerce received no response from Crownridge by the time allotted. Accordingly, on August 2, 2001, Commerce published its preliminary affirmative determination on the matter of SSB from the United Kingdom. *Preliminary Determination*, 66 Fed. Reg. 40192. Therein, Commerce assigned to Crownridge the "all others" margin of 6.85 percent in recognition of the apparent fact that Crownridge "was no longer in business." *Id*. at 40193.

On September 7, 2001, counsel for petitioners informed Commerce that it had received information which contradicted what Commerce had been informed concerning Crownridge's liquidation. PDoc. 127. At Commerce's request, this information was made public in order to afford Crownridge and/or other persons and entities an opportunity to comment upon it. *See* PDoc 134. Specifically, the petitioners alleged that a very short time into Crownridge's formal liquidation its operations had been taken over by one of its major investment creditors. Operating as "Valkia," the "new" company had sold some SSB which had been manufactured by Crownridge. On October 19, 2001, Commerce wrote to Valkia Ltd. via Keith Negal, who had been hired by Crownridge to advise on possible work-out solutions and retained by Valkia post-liquidation, requesting that Valkia respond to the allegation in the petitioners' declaration by November 2, 2001. PDoc 135. At this

time, Commerce advised that "*failure to respond* to this letter may result in the Department's use

of *adverse* inferences in determining an appropriate dumping margin for Crownridge/Valkia in the

Department's final determination . . . ." *Id*. (highlighting added).

Valkia responded, by pre-hearing brief dated November 2, 2001. PDoc 139. Therein, Valkia

accepted that most of the allegations appeared to it to be "substantially correct" but argued that none

of the points raised by the petitioners should affect Commerce's preliminary determination because

neither Crownridge nor any of its directors had the "legal ability" to respond to Commerce's

questionnaire under the insolvency law of the United Kingdom. Valkia thus argued that neither it

nor Crownridge had "willfully failed" to cooperate with Commerce in this investigation. *See id*.

Nonetheless, following a public hearing, *see* PDoc 154 (Dec. 14, 2001), Commerce did alter

its position with respect to Valkia in the final determination. *See Issues and Decision Memorandum*

*for the Final Determination of the Antidumping Duty Investigation of Stainless Steel Bar from the*

*United Kingdom*, PDoc 156 (Jan. 15, 2002) ("*Decision Memo*"). Commerce's final determination

issued on January 12, 2002 drew an adverse inference with respect to "Crownridge/Valkia" and

explained its reasoning as follows:

> The Department's preliminary facts available determination with respect to
> Crownridge was based on information provided . . . by Crownridge's counsel
> and the U.S. Embassy in London which indicated that the company did not
> have the ability to respond to the Department's questionnaire. Based on the
> additional information that has come to our attention since that time, we have
> determined that Valkia is the successor-in-interest to Crownridge and that it
> is more appropriate to apply an adverse inference under section 776(b) of the
> Act [19 U.S.C. § 1677e(b)] because we believe Crownridge and its successor
> company Valkia did not cooperate to the best of their abilities in this
> proceeding.
> * * *
> . . . Valkia . . . informed us in its November 2, 2001 case brief responding to
> the Department's October 19, 2001 letter that: (1) with the financial backing

of one of Crownridge's two principal investors, Valkia had agreed to purchase Crownridge's assets in an arm's length bidding process from the company's liquidator in March 2001, the month after the company entered formal liquidation, but did not formally close the transaction to purchase it until June 2001; (2) on February 26, 2001, Valkia traded and purchased on an arm's length basis some finished SSB from a company that had been a secured creditor of Crownridge and that had taken possession of that SSB under its prior lien (or security agreement) once Crownridge went into liquidation; (3) on March 7, 2001, the liquidator agreed to allow Valkia to occupy and use the plant site while negotiations were pending; and (4) Valkia issued its first invoice of production of SSB on March 14, 2001. Despite Valkia's claims that all of these events occurred without guarantee that final purchase negotiations would ultimately be successful, that Valkia never undertook to honor or cover Crownridge's obligations to creditors, and that it had no right to Crownridge's books and records before the acquisition, the fact remains that these representations are inconsistent with those made by Crownridge's liquidator to the U.S. Embassy prior to the Department's preliminary determination. There was no attempt to disclose these facts to the Department after issuance of the Department's questionnaire on February 20, 2001, or even after issuance of a follow-up e-mail from the Department to Rhodri Phillips, a principal of Crownridge who, according to Valkia, was involved in the bidding process for the purchase of Crownridge's assets, on June 15, 2001. This e-mail notified Mr. Phillips that the Department had yet to receive a questionnaire response from Crownridge which was due on March 29, 2001, and granted the company an additional opportunity until June 25, 2001 to respond to it, and advised of the facts available consequence of non-response. . . .

When the Department made its preliminary determination to assign Crownridge a facts available margin, the Department had reason to believe, based on the facts of record at that time, including representations from Crownridge's liquidator, that Crownridge had completely closed down and that there were no prospects for the resumption of operations with respect to the production and sale of SSB by it or some other entity in the future. As later determined, and by Valkia's own admission, as detailed above, these facts were inaccurate. In addition, neither Crownridge nor Crownridge's liquidator provided any evidence suggesting that Crownridge did not have access to the information. They merely indicated that it would not be relevant, in their view, due to Crownridge's decision not to continue business. However, they failed to disclose accurate facts to the Department about the status of Crownridge or the succession of Valkia to its business, prior to the issuance of the Department's letter in October 2001. Nonetheless under liquidation under UK law[ ], a number of Crownridge's directors and

management and other relevant participants remained available, and indeed had returned to work on the site either while still with Crownridge or newly retained by Valkia as early as March 2001. In January 2001, Crownridge was still operating, and officially went [in]to liquidation on February 6, 2001. It was only a matter of weeks, however, before Valkia began operations there as of March 6, 2001.

. . . [T]he Department finds that Valkia is the successor-in-interest to Crownridge. The entire business complex of Crownridge was transferred to Valkia, with operational control held by Valkia in March 2001 and full legal control from June 13, 2001 (prior to the final submission deadline for Crownridge of June 25, 2001). According to information from Crownridge, Valkia, or the petitioners which has not been denied, the following has occurred: Crownridge's production assets were transferred, Valkia purchased and sold Crownridge product to Crownridge customers, Valkia has overlapping ownership and maintained part of the senior management and the plant management and sales director positions of the former Crownridge operation, and has continued Crownridge's commercial activity. Clearly, the U.K. liquidator concluded that his pending sales arrangements with Valkia were of adequate strength to agree on March 7, 2001 to Valkia occupying and using Crownridge's site and machinery with effect from March 6, 2001.[ ] The same liquidator, acting "[f]or and on behalf of Crownridge", provided contradictory information to the Department (via the U.S. Embassy in London), which is one vital part of the Department's findings of failure to cooperate and the appropriateness of taking an adverse inference. These findings and analysis however do not rely on the liquidator alone, who was appointed to wind up Crownridge's business and transfer assets to creditors. [ ] Other members of the Crownridge management and staff clearly remained available through this time, and we note that the directors of Crownridge owed a duty to work pro-actively with the liquidator in bringing maters to a conclusion and could have worked with the Department.[ ] We note also that Mr. Negal had been retained by Crownridge in October 2000 to help salvage the company, and that he was retained by Valkia to such effect that the liquidator wrote to him on March 7, 2001. According to Valkia and Valkia's counsel (formerly Crownridge's counsel)[ ], Crownridge's books and records remained at the Crownridge office in London, even after its closing. Some kind of response by Crownridge could have been made before June 25, 2001, but the company chose not to.

The fact that Crownridge was under liquidation, given the circumstances in which its business was quickly being transferred to Valkia, does not prevent the Department from concluding that Valkia is the successor-in-interest to Crownridge. If the new company operates as the same business entity as the

former company, the Department will accord the new company the same antidumping treatment as the predecessor. *See Final Results of Antidumping Duty Administrative Review: Large Power Transformers From Italy*, 52 FR 46806 (Dec. 10, 1987). As the Court of International Trade concluded in upholding our determination above that the second Italian company was the successor of the first original business in liquidation, "[t]he ultimate question was whether the activities in Italy were 'old' or 'new'. The agency found them to be old . . . ." *Nuove Industrie Elettriche di Legnano S.p.A. v. United States*, 14 C.I.T. 334, 342 (June 1, 1990). Likewise, we find that the old activities of Crownridge are being continued by Valkia. According to information from Crownridge, Valkia, or the petitioners which has not been denied, the following has occurred: Valkia has some of the same principal owners and plant manager and sales director; it has the same production facilities; it has maintained the same supplier relationships; and it has maintained the same customer relationships. In considering these factors, therefore, for purposes of the final determination, we have deemed Valkia the successor in interest to Crownridge, and as such find it appropriate to assign it the margin otherwise applicable to Crownridge, in accordance with our normal practice.

\* \* \*

In this case, we have determined that Crownridge's representations prior to the preliminary determination were misleading and incomplete and that the company failed to cooperate [in accordance with 19 U.S.C. § 1677e(b)] by not acting to the best of its ability to comply with the Department's requests for information. Therefore, an adverse inference is warranted. . . . Moreover, even though Crownridge itself went into liquidation, it is clear that the key personnel and information were present throughout all this time and that the combined commercial activities of Crownridge and Valkia continued with very little gap in commercial activities. Thus, we conclude that these companies had the ability to cooperate, but had a reason and strategy not to do so.

*Decision Memo* at 14-18 (footnotes omitted).

On January 23, 2002, Commerce issued its final determination of sales at less than fair value.

67 Fed. Reg. 3146. On March 7, 2002, Commerce imposed *Antidumping Duty Order: Stainless Steel Bar from The United Kingdom*, 67 Fed. Reg. 10381 (Mar. 7, 2002). This action followed.

***Discussion***

The Court has jurisdiction over the matter pursuant to 19 U.S.C. § 1516a(a)(2) and 28 U.S.C. § 1581(c). The standard of review is whether the challenged agency determination is "unsupported by substantial evidence on the record, or otherwise not in accordance with law." 19 U.S.C. § 1516a(b)(1)(B)(i). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Matsushita Elec. Indus. Co. v. United States*, 750 F.2d 927, 933 (Fed. Cir. 1984) (quoting *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938), and *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 477 (1951)). This standard requires "something less than the weight of the evidence, and the possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence." *Consolo v. Federal Maritime Comm'n*, 383 U.S. 607, 620 (1966). However, substantial evidence supporting the agency's determination must be based on the whole record, and a reviewing court must take into account not only that which supports the agency's conclusion, but also "whatever in the record fairly detracts from its weight." *Melex USA, Inc. v. United States*, 19 CIT 1130, 1132, 899 F. Supp. 632, 635 (1995) (citing *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 478, 488 (1951)).

I

Valkia's principle argument is that Crownridge's liquidator and directors were without the legal authority to respond to Commerce's questionnaire as a matter of U.K. law once Crownridge's members resolved to liquidate the company. If so, the fact that the liquidator did not respond to the questionnaire and subsequently made apparent misstatements are irrelevant to the final analysis.

Valkia stresses that a U.K. liquidation is not merely a reorganization. Under U.K. law, at liquidation the board's and members' power over the company ceases, and the appointed liquidator acts as a fiduciary to wind up the company's affairs for the benefit of the company's creditors. He must preserve and swell the company's assets for the company's creditors, and only the liquidator or persons sanctioned by him or the relevant creditor's or members' committee is authorized to deal with the assets, liabilities, bank account, and employees of the company. Pl.'s Br. at 11-12 (citations omitted). Valkia argues that an antidumping questionnaire cannot logically be considered an "asset" to be preserved, and responding to one would have depleted the remaining corporate assets and subjected the liquidator to suit for violating his duties towards creditors under the Insolvency Act 1986. Pl.'s Br. at 13-14, referencing Bailey, Groves & Smith, *Corporate Insolvency*, Ch. 10 ("Liquidators") § 10.32 (Butterworths, London, 2002), and Fletcher, *The Law of Insolvency* (Sweet & Maxwell, 1996), p. 506 (discussing §§ 91(2) and 103 of the Insolvency Act). Furthermore, Valkia argues, any response from Crownridge would have been a futile gesture because the company was being liquidated, rendering a margin determination with only prospective effect meaningless. Thus, Valkia argues that the administrative record does not contain substantial evidence to support an adverse inference since it does not evince "willful" failure to cooperate with Commerce in its investigation, either by the Crownridge directors or by the liquidator.[3]

---

[3] Valkia also emphasizes that the decision to liquidate was considered as a possible eventuality long prior to the petitioners' filing of the petition and that it was cumulative, not solely the result of the antidumping investigation, although this was the tipping point. It also underscores that Crownridge's legal counsel were discharged when the company went into liquidation, and that it was not until October 19, 2001 that "Crownridge/Valkia" was advised that "failure to respond to this letter may result in the Department's use of *adverse* inferences in determining an appropriate dumping margin for Crownridge/Valkia in the Department's final determination[.]" PDoc 135

(continued...)

The government characterizes the issue as whether Commerce's decision to apply an adverse inference was in accordance with law. Def's Br. at 15-16. It contends that Valkia has not offered credible support for its contention that Commerce's interpretation of the relevant provisions of the Insolvency Act 1986 was unlawful and that the matters Valkia referenced rather confirm Commerce's conclusion that Crownridge possessed authority to respond through either the liquidator or its corporate officials. *Id*. Quoting from Commerce's analysis:

> The liquidator, carrying authority and discretion, could have arranged for an answer. Under UK law, the directors have an ongoing duty to remain pro-active with the liquidator in handling the winding up affairs of the company. The liquidator focuses on securing and finalizing asset distribution to creditors and others. *See R v McCredie; R v French* (1999) Times, 5 October (Court of Appeal: Henry LJ and Holland and Hallett JJ) (in Lexis-Nexis, Halsbury's Laws of England and Monthly Review) which held that, on winding up of a company, company officers owed the company a duty to comply with Section 208(1), which required co-operation with the liquidator on a pro-active, rather than a reactive, basis in disclosing company property unknown to the liquidator. Further, the commercial responsibilities relating to assets and documents were a continuing, rather than a once for all time, duty and did not depend on a prior request from the liquidator.

*Decision Memo*, at 17 n.5. *See* Def's Br. at 16.

The petitioners view the matter somewhat differently, emphasizing that the liquidator as Crownridge's representative actually "*did* provide information" – information which proved to be "misleading and false." Def-Int's Br. at 16-17 (footnote omitted, emphasis in original). The petitioners also point out that Valkia repeatedly asserted "as a matter of fact" that Crownridge did not have the ability to respond to the antidumping questionnaire once it entered liquidation. Seeking

---

³ (...continued)
(italics added). To which Valkia did, in fact, respond, as requested. *See* PDoc 139. Prior thereto, Commerce questionnaire apparently gave Crownridge the choice of whether or not to respond.

to hoist Valkia by its own petard, the petitioners argue that Valkia did not provide any factual support for this claim to Commerce and does so only belatedly here. The petitioners argue that the Court should "reject Valkia's late attempt to provide some factual basis for its arguments." *Id*. at 17.

Addressing this latter point first, the Court construes the petitioners' argument as a motion to strike directed at a copy of an e-mail attached to Valkia's brief from the Technical Section of The Insolvency Service, U.K. Department of Trade and Industry. *See* Pl.'s Br. Ex. 9. The copy is an e-mail "enquiry" which asked The Insolvency Service whether "there [is] any authority to support the position that the liquidator is under no obligation to respond to a questionnaire addressed to a company (now in liquidation) from a . . . non-U.K. governmental agency[,]" to which the Technical Section responded,

> broadly speaking, there is nothing contained within the insolvency legislation that requires a liquidator to provide information regarding the company to any parties other than the creditors. However, if requirements are imposed under other legislation, *e.g.*, Employment Protection Regulations, Health & Safety legislation, etc., the liquidator would normally comply with those requirements.

*Id*.

The submission is within the realm of Valkia's permissible argument. *See Nuove Industrie*, *supra*, 14 CIT at 337-39, 739 F. Supp. at 1570-72. The motion to strike is therefore denied.

Regarding Valkia's substantive points, it would be incorrect to assume that determining the margin of dumping for a company which has ceased to operate is irrelevant. It is true that the margin determined at the initial investigation is prospective in effect, however the margins of all investigated companies are relevant to an "all others" rate which, under current practice, would be determined as a weighted average of individual margins from the investigation. The margin for a defunct

business would also be relevant to a subsequent purchaser of its assets if, as happened here, such a purchaser is determined to be the operation's successor in interest.

Valkia stresses that the potential liability of the liquidator for malfeasance or negligence prohibited him from responding to Commerce, but it also notes that there is "an absence of authority under U.K. insolvency legislation regarding the liquidator's duties to provide information regarding Crownridge to parties other than the creditors." Pl.'s Br. at 13 (citation omitted). Valkia would therefore agree that U.K. law on the subject was a matter of interpretation. *Cf.* Insolvency Act 1986 § 87 (consequences of resolution to wind up; effect on business and status of company) (1) ("[i]n case of a voluntary winding up, the company shall from the commencement of the winding up cease to carry on its business, except so far as may be required for its beneficial winding up), (2) ("[h]owever, the corporate state and corporate powers of the company, notwithstanding anything to the contrary in its articles, continue until the company is dissolved); § 165 (voluntary winding up) ("[t]he liquidator may, without sanction, exercise either of the powers specified in Part II of that Schedule (institution and defence of proceedings; carrying on the business of the company) and any of the general powers specified in Part III of that Schedule); *id.*, Schedule 4, Part II (4) (power to bring or defend any action or other legal proceeding in the name and on behalf of the company), Part II (5) (power to carry on the business of the company so far as may be necessary for its beneficial winding up), Part III (13) (power to do all such other things as may be necessary for winding up the company's affairs and distributing its assets); Pl.'s Br. Ex. 9 ("if requirements are imposed under other legislation, . . . the liquidator would normally comply with those requirements").

An "absence of authority" is not the equivalent of proscribed conduct. Section 87 clearly authorizes the carrying on of such "business" "as may be required" to wind up the company, and

Commerce implicitly interpreted the provision as empowering the liquidator to respond to the

questionnaire as "required business" *à la* reporting for purposes of Crown or VAT taxes. The Court

must defer to the agency's interpretation in the absence of proof that it was unlawful. *See Nuove*

*Industrie, supra*, 14 CIT at 338-39, 739 F. Supp. 1571-72 (analogizing USCIT Rule 44.1 to

Fed.R.Civ.P. 44.1 and the analysis of *Baumberger v. Clark*, 390 F.2d 485, 488 (D.C. Cir. 1968). *Cf.*

*Swarts v. Hammer*, 194 U.S. 441, 444, 24 S.Ct. 695, 696 (1904) ("[b]y the transfer to the trustee no

mysterious or peculiar ownership or qualities are given to the property . . . there is nothing in that

to withdraw it from the necessity of protection by the State and municipality, or which should

exempt it from its obligations to either"). Disregard of Commerce's questionnaire therefore ran the

risk of being interpreted as a business decision bearing the risk of noncompliance.

Valkia argues that Crownridge's "non-responsiveness" was not willful in view of the

circumstances of liquidation, and the argument is somewhat persuasive when considered in view of

the fact that Commerce initially concluded that the liquidator was operating consistent with its

statutory duties in not responding to its requests for information. *See Preliminary Determination.*[4]

---

[4] It may be that "ignorance of the law is no excuse," but to require a bankrupt to obtain the benefit of legal counsel in order to properly respond to an antidumping questionnaire is inequitable. Commerce must therefore accord due sensitivity to the degree of familiarity or expertise of the person appointed to wind up the affairs of the bankrupt with U.S. antidumping procedure. For example, in this instance Commerce's standard instructions to Crownridge enclosed with its standard questionnaire essentially informed that if Crownridge did *not* respond, then the administrative determination *may* be based upon "facts available" (and as distinguished from "adverse facts available). *See, e.g., Liquidation Memo* at Att. 5 (e-mail of June 15, 2001 from Commerce to Rhodri Phillips). To the accounting professional charged with Crownridge's liquidation, it would not necessarily have been unreasonable to conclude that there was a choice in whether to respond: taken at face value, the instruction appears to assert that if Crownridge chose not to participate, Commerce would "do its best" to make a determination based on whatever facts happen to be available at the time, and that it would be a waste of time and remaining company assets to respond, since the

(continued...)

But, to the extent that Valkia's argument invokes an inability to respond because of the lack of resources for responding to Commerce's requests for information, 19 U.S.C. § 1677m(c) requires Commerce to avoid "imposing an unreasonable burden on [an interested] party" and to provide "any assistance that is practicable in supplying such information." Commerce presumably stands at the ready to do so, consistent with its statutory duties, but in the absence of notification of difficulty in responding, it cannot.

Be that as it may, the liquidator was certainly not within his rights or duties in providing the misinformation that wound up, albeit as hearsay, on this administrative record.[5] That circumstance colored Commerce's interpretation and undermined the strength of Valkia's position that Crownridge's non-responsiveness had not been willful. Valkia contends that such misinformation was *ultra vires*, in derogation of the liquidator's responsibilities to Crownridge, and certainly not authorized by Valkia, however the petitioners correctly point out that such misstatements are no less attributable to Crownridge. The liquidator is the company's statutory representative, and the Court cannot conclude on the basis of the record that it was erroneous for Commerce to conclude that

---

[4] (...continued)
company is about to cease to exist (and, after all, an investigation into the margin of dumping for a particular company is grounded upon sound analysis of relevant facts rather than mere conjecture and speculation, is it not?). In other words, Commerce's questionnaire "request" does not necessarily evince interpretation as "incentive" to participate that opposing counsel apparently favors. At any rate, Commerce did accord to Crownridge favorable consideration for non-responsiveness in the preliminary determination.

[5] Valkia argues that the only "misstatement" of record, the e-mail from USFCS personnel, is a "mere scintilla." It may well be the case that the e-mail embodies more the thoughts of the USFC than answers from the liquidator, but the Court concludes that its contents reflect more than a mere scintilla, and there is no basis in the record to doubt its apparent objectivity in summarizing the liquidator's responses to the questions posed.

Crownridge had not acted to the best of its ability in the investigation. Valkia's contention might be more appropriately directed against the liquidator rather than Commerce, but it is only in the context of finding Valkia to be a successor in interest that the matter has significance.

II

In the antidumping context, Commerce is concerned with how a new enterprise can be expected to act in the future. Commerce's traditional position has been that the degree of continuity between the "old" and "new" enterprises, as evident in changes in (1) management, (2) production facilities, (3) supplier relationships, and (4) customer base, answers that question. Valkia challenges this successor-in-interest test as *per se* and therefore arbitrary and capricious, or at least unlawful as applied in this instance, by analogy to the test of succession used in the countervailing duty context, where the concern is whether new ownership of a previously-subsidized company eliminates the financial benefits conferred. The countervailing "same person" test examines continuity of (1) business operations, (2) production, (3) assets and liabilities, and (4) company personnel, however it has recently been determined *per se* in application and therefore an unlawful abdication of Commerce's duty to analyze the substance of the transaction to determine whether the new entity received not only a financial contribution but also a benefit. *See Delverde v. United States*, 202 F.3d 1360 (Fed. Cir. 2000); *Acciai Speciali Terni S.p.A v. United States*, Slip Op. 02-10 (CIT Feb. 1, 2002); *Allegheny Ludlum Corp. v. United States*, 26 CIT ___, 182 F. Supp. 2d 1357 (2002), *opinion after remand*, 26 CIT ___, 246 F. Supp. 2d 1304 (2002), *aff'd*, 367 F.3d 1339 (Fed. Cir. 2004).

As the petitioners point out, Commerce apparently recognizes that the two tests are different considerations for different contexts. *Cf. Final Results of Redetermination Pursuant to Court Remand, Allegheny Ludlum Corp et al. v. United States*, Consol. Court No, 99-09-00566 at 13-14

(Dec. 20, 2000) (currently available at http://ia.ita.doc.gov/remands/99-09-00566.htm) (distinguishing between successor-in-interest and same-person tests). Nonetheless, Valkia argues that whether there are

> any ostensible differences between the tests, they are identical in their effect. Both tests serve to impose a rate that has been calculated for one company against a new company, regardless of whether the new company has been created through an arm's length purchase. . . .
>
> Even if the Court accepts Commerce's extraordinarily broad definition of successor-in-interest test [*sic*], the limited record in this case does not provide adequate factual information for Commerce to make a reasoned determination of successorship regarding Valkia. Rather, the so-called facts in support of Commerce's determination are limited to unsupported allegations by the petitioning members of the U.S. industry, statements allegedly made by the liquidator, who was not authorized to speak for Valkia, and the statements in the November pre-hearing brief submitted to Commerce by Valkia after Valkia had finally been made aware that its own operations were under consideration. But Valkia's statements are mis-characterized. For example, contrary to the [government's] assertion that[ ] "many senior management officials transferred to Valkia,[ ]" the record identifies only one individual from Crownridge – a consultant brought in to salvage the now defunct company's operations – who became a member of the senior management team at Valkia.

Pl.'s Rep. at 6 (footnote omitted). Responding, the government and the petitioners point out that whether there is insufficient information on the record to find successorship, Commerce could conclude that Valkia is Crownridge's successor in interest on the basis of facts otherwise available.

If the result of a "test" inquiry is not predetermined or automatic, then it has not been applied in a *per se* manner. In the countervailing duty context, congressional proscription against *per se* testing is plain from 19 U.S.C. § 1677(5)(F), which instructs that a change in ownership does not necessarily mean that the enterprise is no longer countervailable. The absence of a parallel provision in the antidumping statutes does not diminish the argument against *per se* testing as abdication of

Commerce's analytic responsibilities, but "if the statute is silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute." *Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 842-43, 104 S.Ct. 2778, 2782 (1984).

Ostensibly, in the antidumping context Commerce recognizes that the successorship inquiry is based upon on the totality of the circumstances of each case. *See*, *e.g.*, *Notice of Initiation of Changed Circumstances Antidumping Duty Administrative Review*: *Certain Stainless Steel Butt-Weld Pipe and Tube Fittings From Japan*, 67 Fed. Reg. 39676, 39676-77 (June 10, 2002); *Brass Sheet and Strip from Canada*: *Notice of Final Results of Antidumping Administrative Review*, 57 Fed. Reg. 20460, 20461 (May 13, 1992). In any event, Commerce must clearly articulate consistent reasoning on *why* certain factors weigh for or against finding successorship,[6] the critical inquiry being whether one can reasonably expect that a change in control has eliminated the past unfair trade practice to which the acquired assets had been previously employed, a consideration which is not dependent upon the representations of new management. *See*, *e.g.*, *Nuove Industrie*, *supra* (successor-in-interest finding based upon a transfer out of liquidation of the "entire business complex" including productive assets, land, contracts, patents, and "all commercial activity;" management's position on successorship dependant upon which would result in lowest margin). Valkia contends that relevant to the question of how it could be expected to act with the assets of Crownridge from liquidation is the fact of record that Crownridge's investors were at odds over the

---

[6] *Cf. Marine Harvest (Chile) S.A. v. United States*, 244 F. Supp. 2d 1364 (2002) (contradictory and therefore unreasonable analysis of post-merger entity in comparison of administrative and changed circumstances proceedings).

disposition of the Crownridge assets at liquidation, and its representation that their respective negotiations with the liquidator were competitive has not been contested. Valkia points out that only Mr. Negal was identified as senior management, and it is further apparent that he had been hired by Crownridge only for a short time as a work-out *consultant* to try to salvage Crownridge's operations. Although Valkia does not address the fact that the plant management and sales director positions are overlapping, which would presumably tend toward finding continuity in cost and pricing decisionmaking, Valkia emphasizes that it employed neither the former CEO nor the former financial director of Crownridge, thus removing the influence of those individuals over such matters. Further, Valkia argues, the acquisition excluded a small-diameter SSB drawing line and therefore it did not acquire the "entire" complex of Crownridge (although the petitioners point out that the production line remained on-site). Lastly, Valkia complains that Commerce ignored the fact that Crownridge and Valkia used different distributors for the U.S. market, but it argues that the third and fourth factors of the successor-in-interest test are anyway irrelevant because such intangibles are precisely what effect the worth of any acquisition, *e.g.*, most asset purchases from bankruptcy result in continued servicing of the old customer base and reliance upon existing suppliers.

Obviously, the facts of this matter are less "telling" on the issue of successorship than those considered in *Nuove Industrie*. Nonetheless, it is apparent from the *Decision Memo* that Commerce at least considered the facts of record in reaching its determination. While the Court might reach a different conclusion were it to review the administrative record *de novo*, "the possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence." *Consolo*, *supra*, 383 U.S. at 620. But, Valkia also makes a significant point in stressing that it was an arm's length purchaser of the Crownridge assets

and that imputing it with responsibility for Crownridge's non-responsiveness and the liquidator's misstatements is a misapplication of the successorship test. Valkia's position is that it was not its "brother's keeper" or in a position to insist on (or assist with) Crownridge's compliance with U.S. antidumping law.

The record indeed reflects that all parties, including Valkia, expressed surprise over the discovery of the liquidator's apparent misstatements which wound up on the record. However, as part of its due diligence, a putative purchaser would insist upon full disclosure of all outstanding matters on a contemplated sale of assets that could reasonably affect their use and enjoyment. *Cf.*, *e.g.*, *Burbach Broadcasting Co. of Delaware v. Elkins Radio Corp.*, 278 F.3d 401 (4th Cir. 2002); *Union Pacific Resources Group, Inc. v. Rhone-Poulenc, Inc.*, 247 F.3d 574 (5th Cir. 2001).[7] Commerce does not sit at a negotiation table as some kind of "party," creditor or otherwise, when enforcing U.S. trade law, but the consequence of an antidumping investigation is a kind of contingency which may affect the value of the business being considered. *Cf. Jeanneret v. Vichey*, 693 F.2d 259 (2nd Cir. 1982) (remanding to address effect on value of painting transacted in violation of export restrictions). During negotiations over the disposition of the Crownridge assets, if Valkia had been alert to the possibility of being deemed a successor in interest by Commerce, and assuming a desire to proceed with the acquisition nonetheless, it would have been in Valkia's best

---

[7] It would also appear to be a universally accepted proposition among nations with respect for property rights that it is incumbent upon the seller to convey good, clean, *unencumbered* title, unless the parties otherwise agree that title may be conveyed bearing contingencies. *See, e.g.*, Uniform Commercial Code § 2-312 (warranty of title); 1980 United Nations Convention on Contracts for the International Sale of Goods, U.N. Doc. No. A/CONF. 97/19 (1981), Art. 41 (seller's obligation to deliver free and clear of claims unless otherwise agreed).

interest either to insist that the seller be properly responsive to Commerce or else obtain reliable legal opinion (if not instruction) that Commerce's requests for information could be ignored.

The administrative record here shows nothing of the sort. Of course, Commerce never informed the Crownridge liquidator about the consequences of successorship out of liquidation for purposes of the antidumping investigation. On the other hand, the preliminary information gave Commerce no reason to do so. And yet this entire matter might have been avoided had Commerce simply informed the liquidator or those associated with Crownridge of reasons for continued interest in the disposition of Crownridge's assets.

But, on the other hand, Valkia cannot claim unawareness of the antidumping investigation, being essentially comprised of at least one former Crownridge member and other apparently key individuals involved in the Crownridge operation, and the successor-in-interest test can hardly, by now, be said to be an alien concept in the administration of U.S. antidumping law. While Crownridge may not have had the benefit of counsel with respect to such consideration, there is no indication in the administrative record that Valkia was likewise situated in its negotiations over the Crownridge assets. If Valkia never considered the potential impact of the antidumping investigation on their acquisition as part of its due diligence prior to consummation, neither the record nor U.K. law evinces a reasonable basis for not doing so.

### *Conclusion*

For the foregoing reasons, Commerce's decision to draw an adverse inference in the selection of facts otherwise available and its conclusion that plaintiff Valkia Limited is the successor in interest of the relevant business of Crownridge Stainless Steels Limited is supported by substantial evidence and is in accordance with law. Judgment will enter accordingly.

　　　　　　　　　　　　　　　　　 /s/  R. Kenton Musgrave
　　　　　　　　　　　　　　　　 R. KENTON MUSGRAVE, JUDGE

Dated: June 18, 2004
　　　　New York, New York